349 N.E.2d 258 (1976)
GOLD BOND BUILDING PRODUCTS DIVISION NATIONAL GYPSUM COMPANY, Shoals Plant, Appellant,
v.
REVIEW BOARD OF THE INDIANA EMPLOYMENT SECURITY DIVISION ET AL., Appellees.
No. 2-874A192.
Court of Appeals of Indiana, Second District.
June 22, 1976.
*259 William S. Hall, Edward E. Ferguson, Hall & Render, Indianapolis, Charles J. Griffin, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for appellant.
Theodore L. Sendak, Atty. Gen., Robert S. Spear, Deputy Atty. Gen., Indianapolis, for Review Board of Indiana.
Edward J., Fillenwarth, Jr., Fillenwarth & Fillenwarth, Indianapolis, for appellee Abel.
SULLIVAN, Judge.
The Review Board of the Indiana Employment Security Division (Board) awarded unemployment compensation benefits to Harvey W. Abel and his fellow employee-claimants (hereinafter Claimants), for a period commencing April 26, 1973, the date when Claimants were "locked out" of the Shoals Plant of their employer, appellant Gold Bond Building Products Division, National Gypsum Co. (Gold Bond). Pursuant to Ind. Ann. Stat. XX-X-XX-XX and XX-X-XX-XX (Burns Code Ed. 1974), Gold Bond seeks judicial review of the Board's decision, asserting that the decision is "contrary to law" and contrary to the evidence because Ind. Ann. Stat. XX-X-XX-X (Burns Code Ed. 1974), disqualifies Claimants from receiving benefits in that their unemployment "is due to a stoppage of work which exists because of a labor dispute... ." *260 Finding no error, we affirm the Board's decision.
The Board's detailed "Statement of Facts" may be summarized as follows:
Claimants were members of, and represented in bargaining sessions by, Local 354 of the United Cement, Lime and Gypsum Workers Union, which is affiliated with the AFL-CIO as a part of the Federation's Industrial Union Department (IUD). The International Union represented workers at most of Gold Bond's other plants around the United States but, prior to 1973, each Local had a separate and independent contract with Gold Bond at the particular plant. Throughout this controversy Gold Bond has accused the International Union of attempting to coalesce its various local negotiations into one nationwide contract with the Company, thereby increasing the Union's bargaining power. The Union has denied this accusation.
On March 19, 1973, representatives of Local 354 and the International Union met for the first time with Gold Bond's national and local negotiators to begin bargaining for a new two-year contract at the Shoals Plant. The existing contract was due to expire on April 15, 1973, and both sides had been put on notice that the other would regard the contract as terminated on that date. Additional bargaining sessions involving the International Union's negotiators and representatives of Gold Bond's home office in New York were held on April 2, 3, 12, 13 and 14. Negotiations on the last of these dates were conducted with the aid of a federal mediator. During these early meetings there was a certain amount of negotiative maneuvering by each side, particularly with respect to items 1, 18 and 30 of the Union's proposal and Gold Bond's attempt to "buy off" the Union on those three items by increased insurance and pension benefits.
Items 1, 18 and 30 were considered by Gold Bond to be "IUD items", that is, items promoted by the Industrial Union Department of the AFL-CIO as a part of the International Union's asserted attempt to negotiate a nationwide contract for employees of all Gold Bond plants. The Company's view of these three items cannot be said to be wholly unjustified. For example, item 18 provided for a new contract expiration date which would require termination of Local 354's new contract to coincide with termination of many of the Union's contracts at Gold Bond's other plants. Because the Company feared the Union's power were a national contract to be negotiated, Gold Bond's resistance to the "IUD items" was adamant. Thus, shortly before the existing contract was due to expire at midnight on April 14, Gold Bond proposed increased pension benefits and medical insurance written by Connecticut General Insurance Company, the Company paying the entire cost of the insurance,[1] in return for the Union's withdrawal of the IUD items.
The Union membership at Shoals rejected the Company's "buy-off" plan shortly before the contract expired, but it is important to note that the negotiators for both sides, local representatives as well as those from Gold Bond's home office and the International Union, agreed to continue negotiations beyond April 14 until a settlement was reached. Production at the Shoals Plant did not cease when the old contract expired. Claimants honored their representatives' agreement with the Company to continue working without a contract. It is also significant that, relevant to the parties' positions as of April 14, Gold Bond had yet to propose a "complete economic package" despite Union requests to do so, and had rejected such proposals by the Union as either premature or "too high".
After meetings terminated on April 14, negotiators from the International Union and Gold Bond's home office left the *261 Shoals area and subsequent meetings involved only the local representatives of labor and management. There was testimony that the local negotiators made progress at meetings held on April 18 and 19. Throughout this period operations at the Shoals Plant continued at normal levels. By the end of the April 19 session, the local representatives concluded that they had gone as far as they could towards a final settlement without their superiors from the national offices and agreed to set up a session on April 26 at which both sides could be fully represented.
However, communications somehow went awry and the April 26 meeting convened without the presence of the International Union's representatives or the negotiators from Gold Bond's home office, despite the local representatives' consensus on April 19 that a settlement required national representation. Nevertheless, shortly before the first session of April 26 began, the Shoals Plant Manager, who was acting as the leader of the local management negotiating team, received a telephone call from his superiors at the home office in New York to the effect that he was to deliver an ultimatum to the Local's leadership. The ultimatum was that the Local's membership must pre-ratify a contract "in the range of the Phoenix settlement"[2] by 6:00 P.M. or the Company would "lock out" claimants. The admitted purpose of this move by the Company was to intensify pressure on the Local to reach agreement on a contract.
Prior to any negotiating sessions on April 26, the Shoals Plant Manager drafted a letter to be read to Claimants which indicated that the Company's decision to lock out the employees was premised upon the International Union's supposed adamant refusal to withdraw items 1, 18 and 30 from its proposal. Copies were made of this letter but it was withheld pending the outcome of the day's negotiating sessions.
Bargaining sessions between teams headed by the Shoals Plant Manager and Local 354's president were long and intense on April 26. The negotiating centered on crucial economic issues such as those represented by the International Union's contract with Gold Bond at the latter's Phoenix, Arizona plant, and did not concern the IUD items. After lengthy bickering over the total dollar amount of a new contract, the sessions ended shortly before 4:00 P.M. when the Local's membership met to vote on Gold Bond's newly proposed "complete economic package". This "package" was the Company's first complete economic offer tailored to the Shoals Plant and represented a figure somewhere between the Union's most recent proposal and what the negotiators figured was the "Phoenix settlement". Claimants rejected the Company's offer but voted to continue working and negotiating for a better contract. At this point the plant manager read his prepared letter informing the Union of the Company's decision to lock them out. Production at the Shoals Plant was then stopped. However, even after the letter was read, the local negotiators continued to negotiate into the night, the meeting finally ending as a result of exhaustion on the part of the participants.
The central question in this case is whether Claimants are rendered ineligible for benefits by the opening clauses of Ind. Ann. Stat. XX-X-XX-X, supra, which, as it existed at the time of this dispute, stated:
"XX-X-XX-X [52-1539c]. Work stoppage because of labor dispute  Individual not participating  Separate units of work  Exception.  An individual shall be ineligible for waiting period or benefit rights: for any week with respect to *262 which an employee of the division, designated by the director and hereinafter referred to as the deputy, finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed: ...." (Emphasis added).
Gold Bond asserts that Claimants' unemployment beginning April 26, 1973, was "due to a stoppage of work which exists because of a labor dispute ..." and that the Board erred in not so concluding.
Claimants argue that the Board correctly found XX-X-XX-X inapplicable. Their argument is based upon the rule of law first articulated by this court in Bootz Mfg. Co. v. Review Board (1968), 143 Ind. App. 17, 237 N.E.2d 597, and followed in International Steel Co. v. Review Board (1969), 146 Ind. App. 137, 252 N.E.2d 848, and City Pattern & Foundry Co. v. Review Board (1970), 147 Ind. App. 636, 263 N.E.2d 218. The rule of Bootz is that:
"... good faith negotiations between representatives of management and labor, where the facts show that the bargaining is in a fluid state and no impasse has occurred, gives neither party the right to declare a labor dispute." Bootz Mfg. Co. v. Review Board, supra, 143 Ind. App. at 23, 237 N.E.2d at 601.
The concluding paragraph of the Board's comprehensive written decision reflects that the Board based its decision squarely on its determination that the Bootz rule was applicable here:
"The Review Board ... concludes that there was no work stoppage effected by the claimants herein as a result of a labor dispute on April 26, 1973; that good faith bargaining was continuing as of that date; and that said bargaining was in a fluid state so that no impasse existed, and that the employer unilaterally locked the claimants out, alleging the existence of a labor dispute."
Gold Bond does not take issue with the Board's position that if applicable the Bootz rule would preclude disqualification of Claimants under XX-X-XX-X. Indeed it could not, for we "now consider the rule well settled." City Pattern & Foundry Co. v. Review Board, supra, 147 Ind. App. at 640, 263 N.E.2d at 222. Gold Bond's argument is that the Board erred in concluding that the evidence warranted application of the Bootz rule. Specifically, the Company asserts that, contrary to the Board's conclusion, (1) an "impasse" did exist on April 26, 1973, and bargaining was therefore not in a "fluid state", and (2) the decision to "lock out" Claimants was the product of a "labor dispute", rather than a "unilateral" action by the employer, because based on Gold Bond's reasonable anticipation of a strike by Claimants. Conversely phrased, Gold Bond's second point is that because Claimants had threatened to strike, Claimants were not "unemployed through no fault of their own ..." as is required by Ind. Ann. Stat. 22-4-1-1 (Burns Code Ed. 1974). Gold Bond also asserts error in the Board's affirmance of the Referee's exclusion of certain testimony assertedly relevant to the question of an "impasse".
In its assignment of errors, Gold Bond avers generally that the Board's decision is "contrary to law". The statute which governs our review of "appeals" from decisions of the Review Board states that such an assignment of errors "shall be sufficient to present both the sufficiency of the facts found to sustain the decision, and the sufficiency of the evidence to sustain the findings of facts". Ind. Ann. Stat. XX-X-XX-XX (Burns Code Ed. 1974). We have recently construed the nearly identical language of the statute which governs our review of the Public Service Commission's decisions, Ind. Ann. Stat. 8-1-3-1 (Burns Code Ed. 1973), as providing a "two-tier standard of review... ." City of Evansville v. Southern Ind. Gas & Electric Co. (2d Dist. 1975), Ind. App., 339 N.E.2d 562, 571. Under this two-tier standard, the *263 agency's controlling "finding of ultimate fact" is the conclusion, and the "findings of basic facts" are the premises from which the agency deduced its conclusion.
At the first level of review, we examine only the relationship between the premises and the conclusion and ask if the Board's deduction is "reasonable". City of Evansville v. Southern Ind. Gas & Electric Co., supra. The inquiry at this first level of review may be termed a "question of law". City of Evansville, supra, 339 N.E.2d at 573.
At the second level of review, we inquire into the nexus between the premises or findings of basic facts and the evidence presented to determine if the evidence justified those findings. In this inquiry we are obliged to give substantial deference to the agency's findings, inasmuch as the agency, and not this court, has the opportunity to hear and see the witnesses and the exhibits. Thus, in reviewing the sufficiency of the evidence to sustain the findings of basic facts, we are not at liberty to reweigh the evidence or adjudge the credibility of witnesses but must accept the facts as found by the Board unless:
"(1) The evidence on which the Review Board based its conclusion was devoid of probative value;
"(2) The quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis;
* * * * * *
"(4) There was no substantial evidence supporting the conclusions of the Review Board;
* * * * * *
[or]
"(7) Reasonable men would be bound to reach the opposite conclusion from the evidence in the record."
Williamson Co. v. Review Board (1969), 145 Ind. App. 266, 274, 250 N.E.2d 612, 616; quoted in Abbett v. Review Board (1971), 150 Ind. App. 202, 206, 275 N.E.2d 827, 830; City Pattern & Foundry Co. v. Review Board, supra, 147 Ind. App. at 643, n. 8, 263 N.E.2d at 223, n. 8.[3]
Gold Bond's arguments are directed at different parts of the Board's decision on both levels of our review. With respect to the question of whether the lockout was a unilateral act so that claimants were unemployed through no fault of their own, Gold Bond does not question the evidentiary basis of the findings of basic fact from which the Board drew its conclusion, but rather asserts that only one finding of basic fact is relevant and that the particular finding "while supported by the evidence, is insufficient in law to establish the Review Board's ultimate finding ..." As to whether an "impasse" existed on April 26, Gold Bond asserts that it was unreasonable for the Board to conclude "no impasse" from the relevant findings of basic fact, and that, in any event, the findings of basic fact are contrary to the evidence.

*264 NO ERROR IN CONCLUSION THAT CLAIMANTS WERE UNEMPLOYED THROUGH NO FAULT OF THEIR OWN
The findings of fact relevant to the question of fault or responsibility for Claimants' unemployment are as follows:
(1) "It further finds that thereafter the bargaining meetings were scheduled for March 19, 1973, and such meetings continued intermittently through April 26, 1973, and at the conclusion of the meeting on the aforesaid date the employer advised the claimants through their bargaining agent that no work would be available and that they were locked out as of 11 P.M. on that date.
* * * * * *
(2) It further finds that all times from and after 11:50 P.M., on April 14, 1973, the expiration date in time of the effective labor-management agreement, the union agreed to operate on a day-to-day basis and all of its members continued to appear for work with no evidence of any slowdown in production and the offer to continue on a day-to-day basis was still in effect as of the date of April 26, 1973, the date of the lockout by the employer.
* * * * * *
(3) It further finds that the employer made no offer to the union representing the claimants on the complete economic package until April 26, 1973, at approximately 7 P.M., which offer was rejected by the general union membership who, nevertheless, agreed to continue to negotiate and to work on a day-to-day basis.
* * * * * *
(4) It further finds that the decision to lock the employees out while sufficient orders for production in materials existed was made unilaterally by the employer as a means of intensifying pressure as testified to on cross-examination by an employer's representative."
Gold Bond contends that the above findings cannot reasonably lead to the conclusion that the lockout was not due to any fault on the part of Claimants without an additional finding to the effect that Claimants gave no indication that they would strike if Gold Bond did not accede to their terms. The Company reasons that, inasmuch as the avowed purpose of the Bootz rule is to bring the labor dispute disqualification section of the Employment Security Act into harmony with the Act's purpose of providing compensation to only those whose unemployment was not their fault, the employees are not without fault if their threat of a strike induced the employer to "make the first move" by ordering a "lock out". For authority Gold Bond relies on the fact that both Bootz, supra, and Int'l. Steel, supra, contained a finding that "the record is devoid of any showing that the ... employees had in any manner indicated that they might discontinue working if the employer did not accede to their terms." Bootz, supra, 143 Ind. App. at 20, 237 N.E.2d at 600; Int'l. Steel, supra, 146 Ind. App. at 141, 252 N.E.2d at 850. To buttress the negative implication thus derived, that such a finding is necessary to application of the Bootz rule, Gold Bond also cites Abbett v. Review Board, supra, the only case discussing the rule in which the rule was held inapplicable and the employees disqualified. Gold Bond points to the finding's absence in that case.
What Gold Bond fails to note is that the absence of a finding to the effect that the record lacked evidence of a strike threat did not preclude this court's affirmance of the Review Board's application of the Bootz rule in City Pattern & Foundry Co. v. Review Board, supra. This leads *265 us to conclude that where there is no impasse and where, as here and in Bootz and Int'l. Steel, there is a finding to the effect that the Union "agreed to operate on a day-to-day basis and all its members continued to appear for work with no evidence of any slowdown in production ...", a finding of "no strike threat" is not necessary to permit the inference that the claimants were unemployed through no fault of their own. Moreover, this court's refusal to upset the Review Board's disqualification of the employees in Abbett v. Review Board, supra, does not appear to have turned on the absence of any finding with respect to a strike threat, but rather upon the fact that the evidence warranted a finding of "impasse".
An additional reason for our refusal to overturn the Board's decision because of the lack of any finding of "no strike threat" is that the Board's decision to grant benefits is, as to the employer, a "negative judgment." General Motors Corp. v. Review Board (1970), 146 Ind. App. 278, 289, 255 N.E.2d 107, 114 (concurring opinion). This is so because, at the administrative level, "it is the burden of the employer to prove the ineligibility or disqualification of the employee if an alleged labor dispute is involved in the claim." Ibid; see Ind. Ann. Stat. XX-X-XX-X, supra. The finding which Gold Bond claims is fatally absent from the Board's decision is a "no evidence" finding, i.e., that "the record is devoid of any showing that the [employees ... might discontinue working... ." We have stated that, in the case of negative awards, "[i]f ... the Board fails to make the appropriate `no evidence' finding, the reviewing court can affirm such an award without thereby usurping the Board's fact finding authority," Transport Motor Express, Inc. v. Smith (2d Dist. 1972), Ind. App. 289 N.E.2d 737, 745-746 n. 10,[4] if the court determines that there is no such evidence. We have examined the record and have determined that there was no evidence that Claimants had threatened to discontinue working at Gold Bond's Shoals Plant unless the Company agreed to their terms.

BOARD DID NOT ERR IN DETERMINING THAT NO IMPASSE EX ISTED ON APRIL 26
Gold Bond urges that, under the definition of "impasse" accepted by this court in Abbett v. Review Board, supra, the Board's relevant findings of basic fact are insufficient as a matter of law. Intertwined with this argument is the contention directed to the second level of review, namely that, as to the relevant findings, reasonable men would be bound to reach the opposite conclusions from the evidence in the record. We reject both arguments.
We agree with Gold Bond that our decision in Abbett approves of the concept that an "impasse" is the absence of "an atmosphere in which a reasonable forseeable settlement of the disputed issues might be resolved... ." Abbett v. Review Board, supra, 150 Ind. App. at 207, 275 N.E.2d at 831. We also concur in Gold Bond's view, borrowed from federal decisions applying the National Labor Relations Act, see, e.g., American Federation of Television & Radio Artists v. Nat'l. Labor Relations Board (1968), 129 U.S.App.D.C. 399, 395 F.2d 622, 627, that a settlement is not reasonably forseeable when the parties are deadlocked on certain crucial issues without which an ultimate agreement is not possible. A corrollary to this principle is the notion that room for movement on issues which the parties consider as relatively minor does not obviate the impasse engendered by their deadlock on the "key" issues. See Dallas General Drivers, Local No. 745 I.B.T. v. Nat'l. Labor Relations Board (1966), 122 U.S.App.D.C. 417, 355 F.2d 842. However, we do not agree with *266 Gold Bond that our acceptance of its views as to what constitutes an "impasse" requires reversal.
The Board's relevant findings of basic fact which Gold Bond urges do not permit the inference of "no impasse" are as follows:
"It further finds that during all of said (1) bargaining meetings there was movement by one side or the other, even if only very slightly.
* * * * * *
It further finds that the employer made no offer to the union representing the claimants on the complete economic package until April 26, 1973, (2) at approximately 7 P.M., which offer was rejected by the general union membership who, nevertheless, agreed to continue to negotiate and to work on a day-to-day basis.
* * * * * *
It further finds that written material concerning the specifics of an insurance plan first (3) requested by the union of the employer on April 12, 1973, was not supplied to the union by the employer until July 5, 1973."
The thrust of Gold Bond's attack on the sufficiency of the above findings is that they contain no explicit statement to the effect that the Board found movement, or room for movement, by one side or the other on April 26 on the crucial issues, which in the Company's view are the three so-called "IUD items" and the total dollar amount of the contract. Gold Bond asks us to focus specifically upon finding #(1) and to reverse because the Board's statement lacks an explicit reference to the issues upon which it found "movement". We shall not isolate finding (1) in such a manner. The findings must be read together. It is evident from the Board's references to findings (2) and (3) to the employer's last-minute submission of a "complete economic package", the union's agreement to continue to negotiate and to work despite rejection of that proposal, and the failure of Gold Bond to have presented the Union with the specifics of the insurance plan by April 26 when the Union had requested such on April 12, that the "movement" contemplated in finding #(1) is with respect to the Company's "complete economic package"  certainly a "crucial issue". It is not unreasonable to infer from the Board's findings that the Union's rejection of Gold Bond's first complete economic package, presented as it was at the late date in the bargaining of April 26 and in less than specific terms, was not in any sense of the word a "final" rejection and that the Union contemplated a possible settlement arising from future continuing negotiations. The very fact that the Company's economic proposal was its first one suggests that the "movement" on April 26 was not solely on the part of the Union. In short, the Board's findings are not insufficient as a matter of law to form the premises from which the Board could deduce that there existed on April 26 "an atmosphere in which reasonable forseeable settlement of the disputed issues might be resolved."
At the second level of our review with respect to the "impasse" issue, Gold Bond argues that the Board's findings with respect to movement in the bargaining on April 26 are contrary to the evidence. We disagree.
The crucial testimony came from Gold Bond's own representative at the April 26 bargaining sessions, John Delaplaine, manager of the Shoals Plant. Delaplaine testified that on April 26, IUD items 1, 18 and 30 were not mentioned and "we were talking about an economic package to settle the whole thing." As to the Company's offer on the afternoon of the 26th which the Union had rejected, Delaplaine admitted that it "was not in any stretch of the imagination a final offer on [Gold Bond's] part... ." The plant manager noted also that the Company still had leeway in the area of wages, pension and *267 hospitalization after the Union's rejection of its first offer. And despite the Employer's lockout order, the April 26 sessions ended on a distinctly non-stalemated note: "Towards the end I [Delaplaine] told them I thought we made progress. They were all tired and could not continue."
Gold Bond correctly points out that much of Delaplaine's testimony was contradicted  but the referee and the Board obviously chose to credit Delaplaine's testimony and give to it more weight than any testimony to the contrary. It is not our function to disturb the agency's determination in this respect. See Abbett v. Review Board, supra. The Board had evidence showing that neither side had made a "final" offer or had reached a position from which it felt it had no leeway or room to move. Compare Abbett v. Review Board, supra, 150 Ind. App. at 207, 275 N.E.2d at 831. This evidence provided ample support for a finding that, on April 26, there was movement on crucial economic issues such that negotiations were still in a "fluid state".

EXCLUSION BY REFEREE, UPHELD BY BOARD, OF FEDERAL MEDIATOR'S OPINIONS NOT GROUND FOR REVERSAL
Gold Bond asserts error in the Board's refusal to overturn a ruling of the referee by which a Gold Bond witness was not permitted to recite opinions stated by the federal mediator on April 14 to the effect that the Union's position on that date did not represent a serious effort to reach an agreement. What the mediator had said was variously excluded as immaterial or as lay opinion. The objection was also made that the proffered testimony as to what the mediator had said was incompetent as hearsay. Gold Bond asserts that the mediator's opinions were admissible because relevant to the question of fluidity in the bargaining and the Union's good faith.
Ind. Ann. Stat. XX-X-XX-X (Burns Code Ed. 1974), provides that "[t]he manner in which disputed claims shall be presented and the conduct of hearings ... shall be in accordance with regulations prescribed by the board for determining the rights of the parties, whether or not such regulations conform to common law or statutory rules of evidence and other technical rules of procedure." The relevant regulation prescribed by the Board is Ind. Admin. Rule and Regulation 52-1542b-1 (Burns 1967), which states, in part that:
"All hearings shall be conducted informally in order to determine the substantial rights of the parties. The parties may present such evidence as the referee deems necessary for determining the substantial rights of the parties. * * * In general, rules of evidence and procedure for the trial of civil causes shall govern proceedings before a referee or the review board, but not to such an extent as to obstruct or prevent a full presentation of fact or to jeopardize the rights of any interested party. * * *
In general, hearsay evidence shall not be considered, but the referee shall consider all such hearsay evidence as would be admissible under common law and statutory rules of evidence of courts in this state and may, in his discretion, consider all hearsay evidence of whatever nature to which timely objection is not made by an `interested party'."
To the procedural scheme set forth by the rule quoted above, it must be added that neither the referee nor the Board can "ignore competent evidence." Williamson Co. v. Review Board, supra, 145 Ind. App. at 277, 250 N.E.2d at 618. Thus, it may be stated as a general proposition that the exclusion and admission of evidence is committed to the sound discretion of the referee; such discretion being limited at one extreme by the proviso that he cannot ignore competent evidence, and at the other by the principle that evidence inadmissable according to the common law and statutory rules of evidence, such as hearsay, should not ordinarily be considered  though this *268 last limiting principle is not to be strictly enforced by this court. See Lewis v. Review Board of Employment Sec. Div. (2d Dist. 1972), 152 Ind. App. 187, 282 N.E.2d 876.
Applying the principles summarized above, we hold that the Board did not err by ignoring competent evidence. A recitation of the absent mediator's opinions was inadmissable as hearsay under general evidentiary rules. Our Supreme Court has stated that:
"Hearsay evidence has been defined as testimony by a witness in a judicial proceeding relative to an extrajudicial declaration by another and which is offered for the purpose of proving the facts asserted by the declarant. Wayne Works v. Hicks Body Co. (1944), 115 Ind. App. 10, 55 N.E.2d 382; Griffith v. Thrall (1941), 109 Ind. App. 141, 29 N.E.2d 345. For testimony to be inadmissible as hearsay, it is necessary that the extrajudicial declaration be offered to prove the `facts asserted by the declarant.'" Trustees of Indiana University v. Williams (1969), 252 Ind. 624, 251 N.E.2d 439, 443.
See also, Blue v. Brooks (1973), Ind., 303 N.E.2d 269, 273; Coakley v. State (3d Dist. 1972), 152 Ind. App. 280, 282-3, 283 N.E.2d 392, 393-394.
The federal mediator's opinion, first stated by him to Company representatives during the bargaining sessions, to the effect that the Union was not serious in attempting to secure an agreement, falls within the above-quoted definition of inadmissible hearsay. Gold Bond's counsel in effect conceded that the purpose of offering the mediator's extrajudicial declarations was to prove the truth of the matters contained therein when he argued for the declaration's admission on the grounds that it was relevant to the question of fluidity and movement in the bargaining since, presumably, insincere and unrealistic demands by the Union would tend to show the absence of "an atmosphere in which a reasonable forseeable settlement of the disputed issues might be resolved ...,", i.e., an "impasse".
Gold Bond does not direct us to, nor can we find any circumstances or exceptions to the hearsay rule which would compel admission of the otherwise inadmissible hearsay evidence of the mediator's opinions. The fact that the evidence was excluded as being immaterial, rather than because hearsay, does not affect our affirmance herein because the general rule that "an exclusionary ruling will not be found erroneous if sustainable on any valid theory ..." American United Life Ins. Co. v. Peffley (2d Dist. 1973), Ind. App., 301 N.E.2d 651, 655, applies to our review of adjudicative proceedings before administrative agencies as well as to proceedings before courts. While affirming the referee's exclusion of this hearsay evidence, we note that it does not necessarily follow that we would reverse had the evidence been admitted over proper objection. The dichotomy exists because it is clearly the policy of the legislature, the Board itself and this court that the referee ought not strictly construe such exclusionary principles of the law of evidence as the hearsay rule, but rather should conduct the hearing informally "... in order to determine the substantial rights of all parties involved." Lewis v. Review Board, supra, 152 Ind. App. at 194, 282 N.E.2d at 880-881.
Affirmed.
WHITE, J., concurs.
BUCHANAN, P.J., dissents with separate opinion.
BUCHANAN, Judge (dissenting).
I respectfully dissent from the majority opinion on two grounds:

ONE The rule of Bootz Mfg. Co. v. Review Bd. (1968), 143 Ind. App. 17, 237 N.E.2d 597, is not a correct statement of the law of Indiana, or elsewhere.

*269 TWO Even if Bootz were applicable, there was no finding by the Board that the threat of a strike did not exist.

ONE
Bootz,[1] the 1968 Indiana Appellate Court case followed by the majority, has the dubious distinction of being in a class by itself. Except for four recent cases[2] of this Court which have applied its extraordinary doctrine, no other Indiana Supreme Court or Appellate Court decisions have done so. To the contrary, Indiana cases have held that "any controversy concerning terms or conditions of employment" is a "labor dispute" as defined by statute,[3] whether the work stoppage takes the form of a strike or a lockout, and without reference to such refinements as fluid negotiations, impasse, or good faith. See Adkins v. Indiana Employment Security Division (1946), 117 Ind. App. 132, 70 N.E.2d 31; Walter Bledsoe Coal Co. v. Review Board (1943), 221 Ind. 16, 46 N.E.2d 477.
The same is true in other jurisdictions. Except for some states having statutes specifically exempting lockouts from the definition of a labor dispute,[4] the majority of jurisdictions hold a lockout may be a labor dispute within the meaning of the disqualification provision of unemployment compensation statutes.[5]
This is not surprising in view of the fact that the underlying intent of our Act, like others, is to deny benefits to those employees out of work by some voluntary act on their part. The declaration of policy in the statute relating to unemployment security is that "... the enactment of this measure to provide for payment of benefits to persons unemployed through no fault of their own... ." IC 1971, 22-4-1-1 (Burns Code Ed.).
The justification for the enactment of such statutes is that the state should not interfere in labor-management controversies if a labor dispute has resulted in a work stoppage. See Artim Transp. Sys., Inc. v. Review Board (1971), 149 Ind. App. 137, 271 N.E.2d 494, 499; Basso v. News Syndicate Co., Inc., 90 N.J. Super. 150, 216 A.2d 597 (1966); Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U.Chi.L.Rev. 294 (1949).
*270 Voluntary action is taken by employees when they engage in a disagreement with their employer. As our Supreme Court said in Walter Bledsoe Coal Co. v. Review Board, supra:

Here was a disagreement between the employer and the employees as a whole as to wages; a demand by employees for new and different terms, and a refusal of the employer to comply, and a refusal of the employees to work as a consequence. It was a controversy. This was a strike in the ordinary meaning of the word.
221 Ind. at 21, 46 N.E.2d at 479. (Emphasis supplied.)
Whether strike or lockout, the rationale is the same.
Three years after the Indiana Supreme Court decided Walter Bledsoe Coal Co., the Appellate Court interpreted and followed it in Adkins v. Indiana Employment Security Division, supra; and concluded that under circumstances in which the employees were tardy and management removed their time cards during the course of a controversy over the use of a phone, it was immaterial whether the resulting unemployment was caused by a strike or lockout:
As we view the evidence in this case, it is immaterial whether appellants' unemployment was caused by a "strike" or a "lockout" for the reason that in either event it is crystal clear that such unemployment was the direct and immediate result of the "controversy concerning terms and conditions of employment," which arose on November 9, 1945, between the employer and employees in the employer's machine shop, and, therefore, such unemployment was the result of a "labor dispute" within the meaning and purview of Section 7(f)(3) of the Indiana Employment Security Act.
70 N.E.2d at 35 (citation omitted). (Emphasis supplied.)
This well-reasoned case and many others collected in Annot., 63 A.L.R.3d 88, §§ 5-9 (1975) establish the most defensible rule, i.e., that once employees have voluntarily engaged in bargaining with management and a controversy arises during negotiations between the parties concerning the terms or conditions of employment and a work stoppage results from that controversy, a "labor dispute" exists which disqualifies the employees from benefits. Thus, they are not faultless in the statutory sense. Such a rule assumes of course that the immediate cause for the work stoppage, be it lockout or strike, arises from the controversy concerning terms or conditions of employment.
The question of whether a labor dispute exists in this sense is a factual inquiry for the Review Board. IC 1971, XX-X-XX-XX (Burns Code Ed.).
It is obviously the intent of the Indiana Employment Security Act (the Act) that unemployed persons should receive benefits if their unemployment is "through no fault of their own."[6] The State through this Act indicates it will favor neither party to a "labor dispute." So when employees voluntarily enter into bargaining with management to change the terms or conditions of their employment, which they have every right to do, and a work stoppage results from a controversy during such negotiations, how can it be reasonably maintained that the work stoppage is not due to a labor dispute?
Each party to such a controversy enters the negotiations with their respective weaponry, and if unable to obtain the desired objective by negotiation, seeks to do so by strike, lockout, or whatever. However the resulting unemployment comes about, there is a labor dispute and benefits should be denied without reference to such artificial refinements as fluidity of negotiations, impasse, etc., as required by Bootz.

*271 TWO
Even if Bootz were deemed to be a correct statement of Indiana law, which it is not, this award should be reversed because the Review Board failed to make a finding that a threat of strike did not exist if Gold Bond refused to accept the Claimants' terms.
As the avowed purpose of the Act is to compensate only those unemployed through no fault of their own, the reason for Gold Bond's decision to lockout is relevant. If Gold Bond locked out the Claimants in the reasonable anticipation of an impending strike the Claimants are not faultless.
The Review Board acknowledged the importance of a strike threat and the reason for management's decision to lockout in its specific findings in both Bootz Mfg. Co. v. Review Board, supra, and International Steel Co. v. Review Board (1969), 146 Ind. App. 137, 252 N.E.2d 848. Both of these cases contained a finding that "the record is devoid of any showing that the ... employees had in any manner indicated that they might discontinue working if the employer did not accede to their terms." While Bootz states no authority for its "impasse" standard, it recognizes by implication from this finding that a lockout precipitated by management's reasonable expectation of a strike by its employees is justified and should preclude unemployment benefits.
Unlike the majority, I cannot conclude "... there was no evidence that Claimants had threatened to discontinue working at Gold Bond's Shoals Plant unless the Company agreed to their terms." The record reveals the local union had taken a strike vote and received strike authorization ... a similar vote had led to a strike at Shoals in April of 1969.
As the Review Board did not make a finding that the threat of a strike did not exist (indeed it could not in view of the evidence in the Record), the Bootz impasse rule does not apply ... and the Review Board's decision should be reversed as a matter of law.
For these reasons I would reverse the award of the Review Board and remand the case to the Review Board for proceedings not inconsistent with the views expressed in this dissent.[7]
NOTES
[1] Under the existing contract, Claimants had to contribute to their medical insurance as carried by Blue Cross, Blue Shield.
[2] A contract had been negotiated or was near settlement at Gold Bond's Phoenix, Arizona plant. The precise terms of that "settlement" are not made clear from the evidence nor does it appear that the parties had complete meaningful knowledge of the Phoenix contract terms.
[3] The Williamson Co. court also listed three other grounds for reversing a decision of the Board:

"(3) The result of the hearing before the Review Board was substantially influenced by improper considerations;
(5) The order of the Review Board, its judgment or finding, is fraudulent, unreasonable or arbitrary;
(6) The Review Board ignored competent evidence;" Ibid.
Item number (5) on the above list may fairly be said to be within the first "tier" of our statutory bilevel scheme of review: that the Board's inference of "ultimate fact" was unreasonable. Gold Bond makes no argument with respect to item (3) in the Williamson list, and the Company's complaint with respect to the referee's exclusion of certain testimony, as that decision was affirmed by the Board, fairly comes within item (6) of the summary.
[4] Transfer was granted and our decision reversed by the Supreme Court in Transport Motor Express, Inc. v. Smith (1974), Ind., 311 N.E.2d 424. However, the Supreme Court did say that we had "correctly stated the law... ." 311 N.E.2d at 425.
[1] Bootz Mfg. Co. v. Review Board (1968), 143 Ind. App. 17, 237 N.E.2d 597, reh. den., 143 Ind. App. 111, 238 N.E.2d 472.
[2] See International Steel Co. v. Review Board (1969), 146 Ind. App. 137, 252 N.E.2d 848; City Pattern & Foundry Co. v. Review Board (1970), 147 Ind. App. 636, 263 N.E.2d 218; Artim Transportation v. Review Board (1971), 149 Ind. App. 137, 271 N.E.2d 494; Abbett v. Review Board (1971), 150 Ind. App. 202, 275 N.E.2d 827.
[3] IC 1971, XX-X-X-XX(c) (Burns Code Ed.) defines a "labor dispute" to include:

... any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
[4] Connecticut, Pennsylvania, Kentucky, Maryland, Minnesota, Arkansas, Mississippi, New Hampshire and Ohio have such specific statutory exemptions for lockouts.
[5] The states holding a lockout may constitute a disqualifying labor dispute include Colorado, New York, Florida, Georgia, Idaho, Illinois, Indiana, Michigan, Missouri, New Jersey, Oregon, Texas, Washington, West Virginia, Wisconsin, Utah, California, Alabama and Nevada. See Annot., 62 A.L.R.3d 437 §§ 9-14 (1975) (and cases cited therein). See also 24 Words and Phrases, "Labor Dispute", at 65 (1966).

The Supreme Court of Missouri recently refused to adopt the Bootz approach, preferring to avoid "... the pitfalls inherent in any effort to determine cause and fault in labor disputes." Adams v. Industrial Com., 490 S.W.2d 77, 80 (Mo. 1973).
The Supreme Court of Missouri also stated ... in most jurisdictions in which the question has arisen ... the courts have held that a work stoppage resulting from a lockout arising from a disagreement in matters subject to collective bargaining is a labor dispute entailing disqualification from unemployment benefits.
Adams v. Industrial Com., supra, 490 S.W. 2d at 79.
[6] See IC 1971, 22-4-1-1 (Burns Code Ed.).
[7] The Review Board concedes in its brief at page 12 that "... a `lockout,' as well as a strike, is presumptively a labor dispute [in Indiana]. Adkins v. Indiana Employment Security Division (1946), 117 Ind. App. 132, 70 N.E.2d 31, 34."