**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANTS:

**RICHARD J. SWANSON**
**ROBERT A. HICKS**
Macey Swanson and Allman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
Review Board of the Indiana Department of
Workforce Development

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
New NGC Inc., d/b/a National Gypsum Services
Company

**WAYNE O. ADAMS, III**
Ice Miller LLP
Indianapolis, Indiana



FILED

Oct 18 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LOGAN WININIGER, RICHARD ROBERTS, *et al*, | ) | |
| | ) | |
| Appellants-Claimants, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1203-EX-225 |
| | ) | |
| REVIEW BOARD OF THE INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| NEW NGC INC., d/b/a NATIONAL GYPSUM SERVICES COMPANY, | ) | |
| | ) | |
| Appellees-Respondents. | ) | |

**October 18, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Logan Wininiger and numerous other employees (the Claimants) of New NGC Inc., d/b/a National Gypsum Services Company (the Company) appeal from an adverse determination of their claims for unemployment benefits by the Review Board (Review Board) of the Indiana Department of Workforce Development (the Department). On appeal, the Claimants present a number of issues, which we consolidate and restate as whether the Review Board erred in determining that the Claimants were ineligible for unemployment compensation because they were unemployed as a result of a labor dispute. We affirm.

The Company is a manufacturer of wallboard, plaster, cement rock, and other products used in commercial and residential construction. The Company conducts its manufacturing operations in plants located throughout the United States. This case involves 78 employees at the Company's plant in Shoals, Indiana, all of whom were represented by the United Steel Workers Union Local 70354 (the Union).

The Union and the Company had negotiated a collective bargaining agreement that was set to expire in January 2011, and in November of 2010, the Union informed the Company that it wanted to negotiate a new collective bargaining agreement. The Union and

the Company agreed to exchange proposals, and on January 13, 2011, the Union gave the Company its comprehensive proposal. At a meeting on January 24, 2011, the Company provided the Union with new proposals related to the employees' retirement plans. The Company proposed that current employees forty years old or older would continue with a defined benefit plan as provided in the previous collective bargaining agreement. Employees younger than forty would retain their vested benefits accrued under the defined benefit plan through December 31, 2011, but effective January 1, 2012, they would cease accruing benefits under that plan and would be shifted to a defined contribution retirement account. The Company had decided in 2009 that it could not continue with the previous defined benefit plan because it left the Company open to unknown liability in the future. The defined contribution plan, however, provided the Company with certainty regarding its future contributions. As a result, all contracts negotiated by the Company since 2009 at its other plants have included the new retirement account provision. In addition to the proposed modification to the retirement plans, the Company indicated that it would propose a change to the employees' 401(k) plans that would allow the Company to suspend its matching contributions after giving notice to the Union.

The parties were unable to reach an agreement prior to the expiration of the old collective bargaining agreement, but the employees continued to work and the Company continued to run the plan under most of the provisions of the old agreement. On February 9, 2011, the Company and the Union began negotiating economic issues, including the proposed shift from the defined benefit plan to the defined contribution retirement account and the 401(k) contribution suspension provision. The Company and the Union negotiated a

number of different items, but no agreement was reached with respect to the proposed changes to the retirement accounts and 401(k) provision.

In its March 9 response, the Union rejected the Company's proposals regarding the new retirement account and 401(k) provisions. On the same date, the Company delivered another offer, in which it held to its previous proposals on both of these items. The Union responded on March 10, and again flatly rejected both proposals. In its next offer presented that day, the Company again held to its previous offer on the retirement account and 401(k) issues, and the Union responded by rejecting the Company's proposal on the retirement account yet again. The Union did, however, offer a counterproposal with respect to the Company's 401(k) language. Specifically, the Union proposed that the Company would be permitted to suspend its 401(k) contributions if it first negotiated in good faith with the Union and obtained the Union's agreement. Additionally, at some point on March 9 or 10, the Union representative apparently suggested that the Union might accept a defined contribution retirement plan if the Company could find an account with a guaranteed return.

At the next bargaining session on March 28, 2011, the Company responded to the Union's latest proposal by maintaining its previously rejected offer on the retirement account. The Company responded to the Union's counterproposal on the 401(k) contributions by proposing that instead of being required to obtain the Union's agreement to suspend matching contributions, the Company would be required to meet with the Union, provide information, and explain the need for the suspension. The Company also offered to increase the pre-suspension notice period to the Union from ten days to thirty days. On the same date, the Union rejected the Company's proposals on the retirement account and the 401(k)

4

contributions and held to its March 10 counterproposal on the Company's right to suspend 401(k) contributions. The Company responded by holding to its most recent offer on both of these issues. The Union then offered a contingent proposal whereby it offered to withdraw some of its other proposals in exchange for the Company's withdrawal of certain proposals, including those concerning the new retirement plan and the 401(k) contributions. The Company held to its previous position, and the Union responded by presenting the same contingent proposal, which the Company again rejected.

At the conclusion of the negotiations on March 28, the Company informed the Union that it did not believe that the parties could proceed any further and presented its last, best, and final offer, which contained the same provisions regarding the retirement plan and 401(k) that the Company proposed in its initial counteroffer that day. The Union submitted the offer to its membership but recommended a no vote because of the changes to the retirement account and 401(k) plan. On April 9, 2011, the Company's offer was rejected by a vote of 65-3.

The Union and the Company then went to mediation on May 10, 2011. At the first mediation session, the Union representative again proposed that the Company should offer a new retirement account with a guaranteed return of four or five percent, but the Company concluded that no defined contribution plan with such a guaranteed benefit existed. After a caucus, the Company's representative stated that it was clear that the Union was not prepared to reach an agreement and that negotiations were finished for the day.

At the next mediation session on July 28, the parties were able to clear up a number of items, with the Union withdrawing some demands and the parties reaching a few agreements,

5

but no progress was made on the retirement account or 401(k) language. Specifically, the Union presented a counteroffer, in which it unequivocally rejected the Company's proposal concerning the retirement account and suspension of 401(k) contributions. In its response, the Employer incorporated all tentative agreements that had been reached by the parties on other issues, but held to its previous position on the retirement account and 401(k) contributions. The Union then presented another counteroffer, again rejecting the Company's proposals concerning the new retirement account and the suspension of 401(k) contributions, and the Company responded by again holding to its previous offer. The Union responded that it would need to discuss the matter with the Union's national organization, and the bargaining session came to a close.

On September 2, the Union and the Company continued mediation, this time with the Union's district director in attendance. The district director described the proposed defined contribution retirement plan as an "attack on the middle class", and stated that if the middle class declined significantly, there would be no one left to buy the Company's wallboard. *Transcript* at 187. The Company's representative disagreed and pointed out that employees at other plants who were represented by United Steel Workers Union had agreed to contracts containing the same retirement account proposals. The Union's district director stated that the national organization had not been aware that some of its locals had agreed to those provisions and that now that the national organization was aware of them, it would not agree to them. The district director stated that the Union was opposed to the proposed defined contribution retirement plan, and the Company responded that it would not modify the proposed retirement plan.

Following a caucus, the Union representative presented its next counteroffer, which again rejected the Company's proposals concerning the new retirement account and the suspension of 401(k) contributions. The Company's representative reiterated that the Company would not modify its proposals on those issues and that, based on the Union's stated position and the Company's continued position, there was nothing further to talk about. The Company representative further stated that the Union should take the Company's offer to the membership for another vote and that absent a vote, they were entrenched on these issues. Thereafter, the Company presented its last, best, and final offer, with the addition of the tentative agreements reached during mediation, and the bargaining session ended without the Union making a commitment to take the offer to the membership for a vote. By that time, the Union had presented the Company with fifteen counteroffers, but no agreement had been reached on the retirement account or 401(k) issues.

In a September 4, 2011 email, the Union representative informed the Company representative that the Union wished to continue negotiating and did not consider the bargaining to be at an impasse. The Company representative responded that the Company had no intention of modifying its proposals concerning the defined benefit retirement account or the 401(k) matching contributions and that it appeared that the Union was unwilling to change its position on those issues. The Union representative reiterated that the Union wanted to continue to attempt to reach an agreement, but he did not indicate a willingness to accept the Company's proposals concerning the new retirement account or the 401(k) plan or offer any new proposals on those issues. The Union representative did not indicate that the Company's last, best, and final offer would be presented for a vote, so on September 6, 2011,

7

the Company instituted a lockout. The Company then shifted the work usually performed at the Shoals plant to its other plants, and the Claimants filed applications for unemployment benefits stating that they were unemployed due to the lockout.

On September 9, 2011, the Department requested an initial determination regarding the Claimants' eligibility for benefits. Evidentiary hearings were conducted before an administrative law judge (ALJ) on October 19 and November 21, 2011. On October 24, 2011, five days after the first hearing before the ALJ and approximately six weeks after the lockout began, the Union and the Company met for one more bargaining session. At the meeting, the Union proposed yet again that the 401(k) matching contributions could be suspended only if the Company engaged in good-faith negotiations and obtained the Union's agreement. Additionally, and for the first time, the Union presented an alternative retirement plan. The Company indicated that it would not accept either of these provisions. The Union and the Company made some progress on a separate issue, but at the conclusion of the October 24 bargaining session, no agreement had been reached with respect to the retirement and 401(k) provisions. The Company held to its last, best, and final offer on those issues, and the Union scheduled a vote for November 23, 2011. The record does not reflect whether the employees voted to approve the agreement or when, if ever, the lockout came to an end.

On December 8, 2011, the ALJ issued its decision on the Claimants' applications for benefits. The ALJ found that when the Claimants were locked out on September 6, 2011, the Company and the Union had reached an impasse in their negotiations and, consequently, that the Claimants were ineligible for benefits because they were unemployed due to a labor dispute. The ALJ's decision included the following findings and conclusions:

8

In the present case, at the time of the lock out the parties had been negotiating for eight months with neither party budging at any time on the new retirement account or the 401K provisions. There had been no movement by either party on either of those issues during the entire eight months of the union's fifteen counter offers. While they were fluid on some of the other issues, those two issues were two critical issues which they had made no progress on. As a result the parties were at an impasse. Since the [Company] had indicated that they would not change their position on those issues, and the [U]nion negotiating team had never indicated a willingness to accept those terms the only possible way those issues could have been resolved in the foreseeable future was for them to have been submitted to the [U]nion membership for a vote, but the [U]nion did not get back to the [Company] to indicate that they would consent to a vote prior to the [Company] locking the employees out. The Administrative Law Judge finds that there was an impasse at that point, so the employees were involved in a labor dispute when the [C]ompany locked them out on September 6.

*Exhibits* at 321, 325.

The Claimants appealed the ALJ's decision to the Review Board, and on February 22, 2012, the Review Board affirmed the ALJ's decision. The Review Board adopted and incorporated by reference the ALJ's findings of fact and conclusions of law, with the following addendum:

The parties were at an impasse when the lockout occurred on September 6, 2011. The parties were entrenched on the issues of the new retirement account and the 401(k) account. The [Company] had informed the union that unless the [U]nion presented the [Company's] last, best, final offer to the [U]nion for a vote, the [Company] would consider the parties to be at impasse. The [U]nion had not presented the last, best, final offer to its members for a vote as of the morning of September 6, 2011 when the [Company] instituted the lockout. On appeal, Counsel for the Claimants argues that subsequent negotiations demonstrated that the parties were not at impasse when the lockout began. Contrary to Counsel's argument, any subsequent agreements to meet or to negotiate after the lockout was imposed are not relevant to the issue of whether the parties were at impasse when the lockout began, because the imposition of a lockout does not remove the [Company's] legal obligation to continue bargaining. 29 U.S.C. § 158(a)(5) (2012); *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778, 110 S.Ct. 1542, 1545, 108 L.Ed. 801, 807 (1990).

9

*Appellant's Appendix* at 9.[1] The Claimants now appeal, arguing that the Review Board erred in concluding that the Company and the Union were at an impasse on the date of the lockout and the Claimants were therefore unemployed due to a labor dispute.

The Indiana Unemployment Compensation Act provides that any decision of the Review Board shall be conclusive and binding as to all questions of fact. Ind. Code Ann. § 22-4-17-12(a) (West, Westlaw current with all 2012 legislation). A Review Board decision may be challenged as contrary to law, in which case, the reviewing court reviews the sufficiency of the facts found to sustain the decision and the sufficiency of the evidence to sustain the findings of facts. I.C. § 22-4-17-12(f). Under this standard, we review (1)

---

[1] Although the Claimants' applications for benefits in the Department's records showed that some of the Claimants were employed by one company, whose claims were grouped under Department Case No. 11-22728, and that other Claimants were employed by another company, whose claims were grouped under Department Case No. 11-21164, the parties stipulated at the administrative hearing that all of the Claimants are employed by the Company. The ALJ issued identical decisions under both case numbers, and the Review Board issued a single order pertaining to both case numbers, from which the Claimants now appeal.

determinations of specific or "basic" underlying facts, (2) conclusions or inferences from those facts, sometimes called "ultimate facts," and (3) conclusions of law. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1317 (Ind. 1998).

We review the Review Board's findings of basic fact under a "substantial evidence" standard of review. *Id.* In this analysis, we neither reweigh the evidence nor assess the credibility of witnesses, and we consider only the evidence most favorable to the Review Board's findings. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314. Reversal is warranted only if there is no substantial evidence to support the Review Board's findings. *Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev.,* 735 N.E.2d 1197 (Ind. Ct. App. 2000), *trans. denied.* Next, we review the reasonableness of the Review Board's determination of ultimate facts. These facts involve an inference or deduction based upon the Review Board's findings of basic fact. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314. Finally, conclusions of law are reviewed to determine whether the Review Board correctly interpreted and applied the law. *Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev.,* 735 N.E.2d 1197.

An employee is ineligible for unemployment compensation benefits if his or her unemployment is due to a labor dispute. I.C. § 22-4-15-3(a) (West, Westlaw current with all 2012 legislation). "Not every controversy concerning the terms and conditions of employment, however, constitutes a labor dispute under the Act." *Lacher v. Review Bd. of Ind. Dep't of Workforce Dev.*, 954 N.E.2d 1098, 1104 (Ind. Ct. App. 2011), *trans. denied.* A labor dispute within the meaning of the Act occurs where

11

the bargaining is not in a fluid state and an impasse has developed in the negotiations. An impasse is defined as an absence of an atmosphere in which a reasonably foreseeable settlement of the disputed issues might be resolved. A settlement is not reasonably foreseeable when the parties are deadlocked on certain crucial issues without which an ultimate agreement is not possible. If the facts indicate that good faith negotiations are being conducted between labor and management, and that bargaining is in a fluid state such that there is no impasse, neither party can declare a labor dispute.

*Id.* (quoting *Perfection Bakeries, Inc. v. Review Bd. of Dep't of Workforce Dev.*, 783 N.E.2d 736, 740 (Ind. Ct. App. 2003)). "In other words, if an employer locks its employees out while bargaining is in a fluid state in an atmosphere in which a reasonably favorable settlement might be reached, the employees are not unemployed due to a labor dispute, and may be eligible for unemployment benefits." *Perfection Bakeries, Inc. v. Review Bd. of Dep't of Workforce Dev.*, 783 N.E.2d at 740.

On appeal, the Claimants contend that the Review Board erred as a matter of law by treating the Union's refusal to present the Company's last, best, and final offer to its membership for a vote as dispositive of the impasse determination. According to the Claimants, "the Review Board erred on an issue of law because it made the determination of whether the parties were at an impasse contingent on whether the Union submitted the September 2nd proposal for a vote instead of determining whether the parties were deadlocked in their bargaining positions." *Appellants' Brief* at 21. In a related argument, the Claimants also argue that the Review Board erred as a matter of law because its decision permitted the Company to unilaterally declare a labor dispute. In support of this argument, the Claimants direct our attention to the Review Board's and the ALJ's findings that the Company indicated that it would consider the negotiations to be at an impasse if the Union

12

refused to take the September 2 offer to the membership for a vote, and argues that the Company's position on impasse cannot be determinative of whether the parties were, in fact, at an impasse.

The Review Board adopted the ALJ's extensive findings and conclusions and added its own addendum, which made reference to the Company's statement that it would consider the parties to be at an impasse if the Union would not present the Company's final offer for a vote and the Union's subsequent failure to do so. There is no indication, however, that the Review Board treated either of these facts as dispositive of the impasse question. Rather, the Review Board's order, when read in conjunction with the ALJ's findings and conclusions incorporated therein, clearly indicates that the Review Board considered the entire history of the negotiations in determining whether the parties had reached an impasse, including the Company's indication that the September 2 offer was its last, best and final offer and the Union's refusal to present that offer for a vote. The Review Board's findings must be read together. *Gold Bond Bldg. Prods. Div. Nat. Gypsum Co. v. Ind. Empt. Sec. Div.*, 169 Ind. App. 478, 349 N.E.2d 258 (1976). We must decline the Claimants' invitation to consider these findings in isolation and, as we explain below, there is ample support in the record for the Review Board's finding that the parties were at an impasse. The Review Board did not err as a matter of law by considering the history of the negotiations, which includes the Company's stated belief that the parties were at an impasse and the Union's refusal to submit the Company's last, best, and final offer for a vote, in determining whether the parties were at an impasse.

Next, the Claimants argue that the Review Board erred as a matter of law by ignoring evidence of post-lockout negotiation between the Union and the Company in determining whether the parties were at an impasse as of the date of the lockout. The Review Board found that "any subsequent agreements to meet or to negotiate after the lockout was imposed are not relevant to the issue of whether the parties were at impasse when the lockout began, because the imposition of a lockout does not remove the Employer's legal obligation to continue bargaining." *Appellant's Appendix* at 9. The parties disagree as to whether federal law required the Company to continue negotiating in the face of an impasse. We need not delve into federal labor law in this regard because we conclude that even if the Review Board erred in concluding that the Company was legally required to continue negotiating, the error was harmless because consideration of the post-lockout negotiations could not have altered the Review Board's ultimate conclusion.

As we explained above, six weeks after the lockout began and during the administrative proceedings in this matter, the Union and the Company met for one more negotiating session on October 24. At the session, the Union yet again proposed that the 401(k) matching contributions could be suspended only if the Company engaged in good-faith negotiations and obtained the Union's agreement; this is the same proposal that had first been presented by the Union on March 10 and rejected by the Company. The Union also presented an alternative retirement plan, which was essentially another 401(k) rather than a pension plan. The Company rejected both of these proposals. The Union and the Company made some progress on a separate issue, but at the conclusion of the bargaining session, no agreement had been reached with respect to the retirement and 401(k) provisions. The

Company held to its last, best, and final offer on those issues, and the Union scheduled a vote for November 23, 2011.

We are at a loss as to how a single additional negotiation session, held six weeks after the lockout began and at which no agreement on the crucial issues was reached, could possibly show that the parties were not at an impasse at the time the lockout commenced; rather, such evidence would only be probative of whether the impasse had come to an end. Accordingly, the Review Board did not err as a matter of law in finding that the post-lockout negotiations were irrelevant to the question of whether the parties were at an impasse on the date of the lockout. We reject the Claimants' assertion that the Company's willingness to consider another proposal from the Union must be construed as a tacit concession that there had never been an impasse. In this case, the Company did not alter its previous offer on the retirement and 401(k) issues at the single post-lockout negotiation session, and it appears that the Company returned to the bargaining table only to determine whether, after a six-week lockout, the Union had changed its position on those issues.[2]

Finally, the Claimants argue that the record does not support the Review Board's finding that the parties were at an impasse. As a threshold matter, we must first address the standard of review applicable to this finding. The Claimants acknowledge this court's precedent holding that the existence of an impasse is a factual determination by which this court is bound so long as it is supported by substantial evidence. *See Dietrich Indus., Inc. v. Teamsters Local Unit 142*, 880 N.E.2d 700 (Ind. Ct. App. 2008); *Auburn v. Review Bd. of*

*Ind. Emp't Sec. Div.*, 437 N.E.2d 1011 (Ind. Ct. App. 1982). The Claimants argue, however, that these cases incorrectly classified the determination of the existence of an impasse as a question of basic fact. Specifically, they argue that such a finding necessarily involves an inference from historical facts, and should therefore be classified as an ultimate fact, which is reviewed for its reasonableness. We need not address this argument because we would affirm the Board's finding of an impasse under either standard.

The evidence in this case provides ample support for the Review Board's finding that the Union and the Company were deadlocked on the issues of the new defined contribution retirement plan and the Company's right to suspend its matching contributions to the 401(k) accounts. The history of the negotiations was set forth above and need not be rehashed at length here. In sum, throughout the course of approximately six months of negotiations on economic issues, the Company steadfastly insisted upon the adoption of the defined contribution retirement plan, without modification, as a condition of reaching a new collective bargaining agreement. For its part, the Union steadfastly rejected the Employer's defined contribution plan. At the May 10 mediation session, the Union representative proposed that the Company should offer a new retirement account with a guaranteed return of four or five percent, but the Company rejected this proposal after concluding that no defined contribution plan with such a guaranteed benefit existed, and the Union did not offer any alternative proposals prior to the lockout. The Company also insisted on the incorporation of a provision allowing the Company to suspend its 401(k) contributions.

_____

[2] For the same reasons stated above, we are also unconvinced by the Union's closely related argument that the evidence concerning post-lockout negotiations made the Review Board's factual finding that the parties were at an impasse on the

16

Although the Union proposed a modification requiring the Company to obtain the Union's agreement before suspending matching contributions, the Company rejected this counterproposal, and the Union refused to change its position.

On September 2, after months of exchanging proposals and making no real progress on these issues, the Company finally indicated in no uncertain terms that it was not willing to change its position and submitted its last, best, and final offer. The Company representative stated that if the Union did not present the offer for a vote, it would consider them to be at an impasse. The Union representative indicated that the Union wanted to continue to attempt to reach an agreement, but he did not indicate a willingness to accept the Company's proposals concerning the new retirement account or the 401(k) provisions or offer any new proposals on those issues, and the Union did not present the Company's final offer for a vote.

Contrary to the Claimant's assertions on appeal, the Company's belief concerning the existence of an impasse and the Union's refusal to submit the Company's final offer for a vote, while not dispositive, are highly relevant to the issue of whether the parties were at an impasse. The Company's stated belief that the parties were at an impasse if the Union refused to present its last, best, and final offer for a vote was indicative of the Company's unwillingness to consider changing its position on the retirement account and 401(k) suspension issues. Likewise, the Union's failure to submit that offer for a vote signaled the Union's refusal to accept the Company's final offer. We would be hard-pressed to imagine a clearer indication that the parties were deadlocked on the retirement account and 401(k)

date of the lockout unreasonable.

17

issues. Under these facts and circumstances, the Review Board's findings that a settlement was not reasonably foreseeable and that the Union and Company were at an impasse were both reasonable and supported by substantial evidence.

Nevertheless, the Claimants argue that there was no impasse because the Union was willing to continue negotiating the retirement and 401(k) issues. The dispositive question, however, is not whether the parties are willing to have continued bargaining sessions, but whether there exists "an atmosphere in which a reasonably foreseeable *settlement* of the disputed issues might be resolved." *Lacher v. Review Bd. of Ind. Dep't of Workforce Dev.*, 954 N.E.2d 1098, 1104 (emphasis supplied). Here, at the September 2 mediation session, the Company made it clear that it would not budge on the new defined contribution retirement plan and the 401(k) issues and submitted its last, best, and final offer. Although the Union indicated that it was willing to continue negotiating, it had already indicated by its actions that it would not accept the Company's proposals on those issues by repeatedly rejecting them. The Union further indicated its unwillingness to accept the Company's offer by refusing to present it for a vote. The Union could not prevent an impasse by simply offering to continue to negotiate where such negotiation would in all likelihood be fruitless.

The Claimants also argue that there was no impasse because "[b]y the September 2nd negotiation session, the parties had engaged in productive discussions on both the new retirement account and 401(k) match issues." *Appellants' Brief* at 28. In support of this argument, the Claimants note the Union representative proposed that the Company should offer a new retirement account with a guaranteed return of four or five percent. According to the Claimants, this request "convey[ed] clearly that the Union was not opposed to the concept

18

of a defined contribution plan." *Id.* The Union also points out that at the March 10 bargaining session, it offered a counterproposal to the Company's 401(k) contribution proposal that would require the Company to bargain and obtain the Union's consent before suspending matching contributions.

The Company, however, rejected both of these proposals. With respect to the proposed defined contribution retirement plan with a guaranteed return, the Company concluded that no such retirement plan existed, and the Union did not present an alternative retirement plan prior to the lockout. The Company also rejected the Union's proposal concerning the Company's ability to suspend 401(k) contributions. The Company did, however, make some movement from its original position by proposing that instead of being required to obtain the Union's consent to suspend matching contributions, the Company would be required to meet with the Union, provide information, and explain the need for the suspension. The Union rejected the Company's counteroffer and continued to insist that the Company obtain the Union's consent prior to suspending 401(k) contributions, and the Company continued to reject that proposal. Accordingly, the Review Board's conclusion that the parties were entrenched and unable to reach an agreement on the retirement and 401(k) issues was reasonable and supported by substantial evidence.

The Claimants also argue that there was no impasse because the Union and the Company had made significant progress on other issues and the retirement account and 401(k) provisions were only a small part of the negotiations. The record supports the Claimants' contention that the parties reached a number of agreements on other issues; however, the fact that the parties were able to reach agreements on some issues does not

19

preclude a finding of impasse where the parties are deadlocked on key issues. *See Gold Bond Bldg. Prods. Div. Nat. Gypsum Co. v. Review Bd. of Ind. Emp't. Sec. Div.*, 169 Ind. App. 478 Ind. App. 478, 349 N.E.2d 258. Although the Company and Union made progress on other significant issues, they were deadlocked on the proposed defined contribution retirement plan and the suspension of matching 401(k) contributions, and their disagreement on these crucial issues prevented them from reaching a settlement.

For all of these reasons, we conclude that the Review Board's finding that the Union and the Company were at an impasse on the date of the lockout was both reasonable and supported by substantial evidence. The Claimants' arguments to the contrary are simply requests for this Court to substitute its judgment for that of the Review Board, which we may not do on appeal. The Review Board did not err in concluding that the Claimants were unemployed due to a labor dispute and therefore ineligible for unemployment compensation benefits.

Judgment affirmed.

BROWN, J., and PYLE, J., concur.