WALTER BLEDSOE COAL COMPANY ET AL. *v.* REVIEW
BOARD OF EMPLOYMENT SECURITY DIVISION OF
DEPARTMENT OF TREASURY ET AL.

KNOX CONSOLIDATED COAL CORPORATION *v.* REVIEW
BOARD OF UNEMPLOYMENT COMPENSATION DIVISION
OF DEPARTMENT OF TREASURY ET AL.

LINTON-SUMMIT COAL COMPANY ET AL. *v.*
ABERCROMBIE ET AL.

PRINCETON MINING COMPANY *v.* REVIEW BOARD OF
EMPLOYMENT SECURITY DIVISION OF DEPARTMENT
OF TREASURY ET AL.

[Nos. 27,829-27,832. Filed January 28, 1943.]

*Cooper, Royse, Gambill & Crawford,* of Terre Haute, for appellant Walter Bledsoe Coal Co. and others.

*Adamson, Blair & Adamson,* of Terre Haute, for appellant Knox Consolidated Coal Corporation.

*Morton C. Embree* and *Gerald E. Hall,* both of Princeton, for appellant Princeton Mining Company.

*Hays & Hays,* of Sullivan, and *C. Richard Templeton,* of Terre Haute, for appellant Linton-Summit Coal Company and others.

*McDonald & McDonald,* of Princeton, for appellees.

FANSLER, J.—The employees of the appellant coal companies filed claims for compensation under the Employment Security Act (§ 52-1501 et seq., Burns' 1933 (Supp.), § 10168-1 et seq., Baldwin's Supp. 1937). The claims were referred to the Review Board which held that the claimants were entitled to receive unemployment benefits. The coal companies began these actions in the Appellate Court questioning the legality of the decision.

The facts are not in dispute. The appellants operate coal mines. The employees are members of the United Mine Workers of America. On March 31, 1941, the agreement existing between the Indiana Coal Operators Association and the International Union, United Mine Workers of America, concerning wages, hours, and working conditions, under which the local union operated, expired. The United Mine Workers of America was recognized as the bargaining agent of the employees, members of the local union. The International Union of Mine Workers of America is composed of two districts: (1) The Appalachian Area and (2) the Outlying Districts, including Indiana. Prior to March 31, 1941, the International Union of United Mine Workers of America was negotiating with the Operators of the Appalachian Area for a new contract to become effective April 1, 1941. On March 20, 1941, the appel-

lants' employees who made the claim for employment benefits, and who were members of the local union, proposed to the appellant companies that at the expiration of the contract ending at midnight March 31, 1941, they would continue work in the mines subject to any agreement which was ultimately reached in the negotiations between the United Mine Workers and the Appalachian Operators in respect to increased wages and improvement in hours and conditions, and that any such increases or changes when agreed upon should be retroactive as of April 1, 1941. The coal companies declined to enter into such an agreement, and on March 28, 1941, countered with a proposal that, pending the Appalachian Area agreement, the employees continue to work under the terms and conditions of the contract that was to expire on March 31st. This counter-proposal was rejected, and the employees stopped work at midnight on March 31, 1941.

The question involved is whether, under these facts, the employees were entitled to benefits under the Employment Security Act. The Appellate Court sustained the action of the Review Board.

The first section of the act, § 52-1501, Burns' 1933 (Supp.), § 10168-1, Baldwin's Supp. 1937, declares the purposes of the law as follows: "Economic insecurity due to unemployment is declared hereby to be a serious menace to the health, morale and welfare of the people of this state and to the maintenance of public order within this state. Protection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by encouragement of desirable stable employment. The enactment of this measure to provide for payment of

benefits to persons unemployed through no fault of their own, to encourage stabilization in employment, and to provide for a state employment service is, therefore, essential to public welfare; and the same is declared to be a proper exercise of the police powers of the state." Section 52-1507, Burns' 1933 (Supp.), § 10168-22 to § 10168-26, Baldwin's Supp. 1937, provides that an individual shall be ineligible for benefits: "For any week with respect to which the board finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed; . . ."

Appellants contend that the employees voluntarily stopped work because of a labor dispute. The Appellate Court did not agree with this contention, and held that there was no labor dispute involved.

What is meant by the term "labor dispute" has been the subject of our inquiry, and, to determine the question, we have looked to the entire act and its purposes. The declared purpose quoted above is to provide benefits for persons unemployed through no fault of their own, and to encourage stabilization in employment.

Appellees say that the word "fault" means "something worthy of censure." We cannot believe that the word as used in the statute was intended to have such a meaning. We cannot believe that it was intended that, under war-time conditions such as now exist, a person with regular employment with which he has been satisfied may voluntarily quit work and go forth seeking higher pay in a munitions factory, and make claim for and receive compensation benefits until he finds a position more to his liking or decides to return to his previous employment. It must

be concluded that such unemployment did not occur through no fault of his own. Thus "fault" must be construed as meaning failure or volition. This construction is consistent with the provision that there shall be no benefits paid if unemployment is due to a stoppage of work because of a labor dispute. It is perfectly legal for employees to contend for better wages and working conditions and to refuse work if their demands are not complied with, and it cannot legally be said that such action is worthy of censure or that it constitutes wrongdoing. It must be concluded that the purpose of the act was to provide benefits to those who were involuntarily out of employment, and not to finance those who were willingly and deliberately refusing to work because of a refusal of their employers to accede to demands for higher wages.

We have here in the facts a situation in which the employees refused to continue in their regular employment unless and until the employer agreed that their wages should be based upon a wage scale, the terms of which were to be determined by future agreement then under negotiation. Whether the International Union, then negotiating with the Appalachian Operators, was the bargaining agent of the local union is immaterial. They sought to bargain for themselves under the direction of the International Union, and proposed that they would continue work only upon condition that their pay should be determined by an agreement to be reached by the International Union and the Appalachian Operators. Here was a disagreement between the employer and the employees as a whole as to wages; a demand by employees for new and different terms, and a refusal of the employer to comply, and a refusal of the employees to work as a consequence. It was a controversy. This was a strike

in the ordinary meaning of the word. Webster defines a "strike" as: "Act of quitting work; specif., such an act done by mutual understanding by a body of workmen as a means of enforcing compliance with demands made on their employer; a stopping of work by workmen in order to obtain or resist a change in conditions of employment." "To quit work in order to obtain, or resist, a change in conditions of employment." Webster's New International Dictionary, Second Edition. Strikes are generally considered as coercive. This strike was the result of disagreement after negotiations about wages and working conditions. The fact that the contract under which the employees had been working had expired is of no importance. They were unemployed because of their refusal of an offer of work for wages and under conditions identical with those provided in their expired contract.

While we have not before been called upon to consider this statute, the question is not new, and has been passed upon in many states where the statutes are substantially identical, and in cases in which the facts are substantially identical with those of the case at bar. We find strong support for the conclusion we have reached in the language of the opinions. See *Department of Industrial Relations* v. *Pesnell* (1940), 29 Ala. App. 528, 199 So. 720, *Ex parte Pesnell* (1941), 240 Ala. 457, 199 So. 726; certiorari denied by U. S. Supreme Court, 313 U. S. 590, 61 S. Ct. 1113, 85 L. Ed. 1545; *Barnes et al.* v. *Hall* (1941), 285 Ky. 160, 146 S. W. (2d) 929; *Miners in General Group et al.* v. *Hix et al.* (1941), 123 W. Va. 637, 17 S. E. (2d) 810; *Dallas Fuel Co.* v. *Horne et al.* (1941), 230 Iowa 1148, 300 N. W. 303; *Block Coal & Coke Co. et al.* v. *United Mine Workers et al.* (1941), 177 Tenn. 247, 148 S. W. (2d) 364. The case of *Department of Industrial Relations*

v. *Drummond* (1941), 30 Ala. App. 78, 1 So. (2d) 395, referred to in the opinion of the Appellate Court, was argued at the same hearing in which *Department of Industrial Relations* v. *Pesnell, supra,* was argued. The facts in the Drummond case differ from those in the Pesnell case and in the case at bar and in the other cases above cited. Drummond was a member of the C. I. O. Union and was not a member of the United Mine Workers. The labor controversy was between the United Mine Workers and the employer. There was no disagreement between the employer and Drummond or Drummond's union, and Drummond and his union wanted to continue work, and urged the employer to allow their employment to continue irrespective of the controversy with the United Mine Workers. Fearing violence and possible bloodshed, the employer refused. The court held that Drummond was entitled to benefits, and that it was not intended that he "should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert."

The judgments are reversed, with instructions to the Appellate Court to direct the Review Board to enter orders denying benefits.

O'Malley, J., not participating.

NOTE.—Reported in 46 N. E. (2d) 477.