CITY PATTERN *v.* REVIEW BOARD OF INDIANA EMPLOYMENT SECURITY DIVISION ET AL.

[No. 1269A258.  Filed October 27, 1970.]

*F. Gerard Feeney, James W. Oberfell,* of South Bend, *Edward J. Fillenwarth, Edward J. Fillenwarth, Jr., Fillenwarth & Fillenwarth,* of Indianapolis, attorneys for Amicus Curiae, Indiana Conference of Teamsters, for appellants.

*Theodore L. Sendak,* Attorney General, *William S. McMaster,* Deputy Attorney General, *Irving J. Smith,* of South Bend, *Lloyd L. DeWester, Jr., DeWester, Raftery, Andrews & Hall,* of Indianapolis, attorneys for Amicus Curiae, The Indiana State AFL-CIO, for appellee.

WHITE, J.—This is an original action, pursuant to the "appeal" provisions of the Employment Security Act,[1] for a judicial review of a decision of the Review Board of the Indiana Employment Security Division affirming a referee's decision which held that employee-claimants, otherwise eligible, are eligible for benefits[2] during a period when their places of employment were closed by a so-called "lockout."

The relevant evidentiary facts are not in dispute, although the validity of inferences drawn therefrom by the referee and by the Review Board is vigorously disputed. The board's "Statement of Facts", in so far as it merely summarizes the evidentiary facts and states undisputed ultimate facts, seems to be a fair statement of the genesis of the eligibility question now before us. We have drawn a line through those sentences which the employer-appellants consider unfounded inferences.

> "STATEMENT OF FACTS: The evidence is in agreement that the employers are engaged in pattern making; that the Pattern Makers League of North America, South Bend Association, is the authorized bargaining agent for the claimants herein; that there was a collective bargaining

---

1. Burns Ind. Stat. Ann. §§ 52-1542j and 52-1542k.
2. Burns Ind. Stat. Ann. (1964 Repl.) § 52-1526 defines "benefits" as "the money payments payable to an eligible individual as provided in this act, with respect to his unemployment."

agreement in effect between the employers herein and said association from June 1, 1965, to May 1, 1968; that the employers were notified by letter in February, 1968, that the Pattern Makers Association of South Bend desired certain changes to take effect at the expiration of the existing agreement on April 30, 1968, at midnight; that the first meeting on negotiations was held April 8, 1968, and seven (7) meetings were held thereafter, including one at night on April 30, 1968.

"The record is in agreement that negotiations continued in good faith; that numerous issues were resolved; that during the meeting on April 30, 1968, counter contractual proposals were made by representatives of the employers and employees and rejected; that the employees, through their representatives, offered to continue working under the existing contract, or without a contract, for an indefinite[3] time while negotiations continued for a new one. At approximately 11:30 P.M., April 30, 1968, the employers rejected this proposal and advised the employees' representatives that the plants of the employers herein would not be open for business beginning May 1, 1968, giving the reason as: no contract, no work. (When the employees reported for work on May 1, 1968, they found notices posted which stated that the plants of the employers herein were closed.) ~~The evidence indicates that the above-mentioned negotiations were in a fluid state and had not reached an impasse.~~

"At the time the employers decided to close their plants, there had been no work stoppage by employees, no overt actions by employees to curtail production by slowdown tactics, and no irregular attendance by employees during the weeks prior thereto. The record is conclusive in that the facts show that work was available, the employees had continued working regularly, and they were ready and available for work.

"The employers contended that their plants were closed because they had contracts with various companies and were concerned about meeting their commitments without having a definite contract in effect. ~~The employers unilaterally decided that a labor dispute existed and closed their plants, which caused a lockout status.~~ Subsequent to ratification of new contracts, claimant returned to work for their respective employers on July 22 and 26, 1968.''

---

3. While the employers object to the Board's use of the word "indefinite" as implying, contrary to the evidence, that the employee-claimants had offered to continue working "until agreement is reached," they concede that if it means "with no time limit," it may be correct. We so understand it.

The employers contend that claimants are ineligible for benefits by reason of section 1504 of the act[4] which states that "[a]n individual shall be ineligible . . . [if] his . . . unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . premises at which he was last employed . . . "

The General Assembly has directed us to follow the guidance of its public policy statement in section 101 of the Employment Security Act (Burns IND. STAT. ANN. [1964 Repl.] § 52-1525) in "the interpretation and application of this act." As a part of that statement of public policy, the legislature has said that the act was passed "to provide for the payment of benefits to persons unemployed through no fault of their own" and that such purpose is "essential to public welfare."[5] One may (if he wishes) question the wis-

---

4. Section 1504 is Burns Ind. Stat. Ann. (1964 Repl.) § 52-1539c, which reads as follows:

"An individual shall be ineligible for waiting period or benefit rights: for any week with respect to which an employee of the division, designated by the director and herein after referred to as the deputy, finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed; Provided, That this section shall not apply if it is shown to the satisfaction of the deputy that: he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; and he has not voluntarily stopped working, other than at the direction of his employer, in sympathy with employees in some other establishment or factory in which a labor dispute is in progress; Provided, That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this section, be deemed to be a separate factory, establishment, or other premises; Provided, further, That the deputy may refer claims of individuals falling within the provisions of this section to a referee who shall make the initial determination with respect thereto, in accordance with the procedure in section 1803 [§ 52-1542b] hereof."

5. The entire text of Sec. 101, Burns § 52-1525, is as follows:

"As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is declared hereby to be a serious

dom of the philosophy which underlies this means of promoting the public welfare, but one can hardly question the fairness of seeking to avoid any interpretation of the act which would result in arbitrarily denying benefits to workers unemployed "through no fault of their own." The practical difficulty of interpreting the "labor dispute" in eligibility provisions of section 1504 of the act (Burns IND. STAT. ANN. [1964 Repl.] § 52-1539c)[6] in harmony with that purpose has plagued both the administrators of the act and the courts for years, perhaps since the "labor dispute" clauses were first inserted into the predecessor act, the "Unemployment Compensation Law" of 1936, by a 1937 amendment.[7] Application of the "labor dispute" disqualification in "lockout" cases seems to have been particularly troublesome and a workable rule which gives due regard to the "no fault" concept of the public policy clause does not seem to have evolved until 1968 when we decided *Bootz Manufacturing Co.* v. *Review Board* (1968), 143 Ind. App. 111, 237 N. E. 2d 597, 14 Ind. Dec. 469, Rehearing Den., 238 N. E. 2d 472, 14 Ind. Dec. 703. We followed the *Bootz* rule in 1969 in *International Steel Co.* v. *Review Board* (1969), 146 Ind. App. 137, 252 N. E. 2d 848, 19 Ind. Dec. 618, and now consider the rule well settled. Appellant-employers concede as much

menace to the health, morale and welfare of the people of this state and to the maintenance of public order within this state. Protection against this great hazard of our economic life can be provided in some measure by the required and systematic accumulation of funds during periods of employment to provide benefits to the unemployed during periods of unemployment and by encouragement of desirable stable employment. The enactment of this measure to provide for payment of benefits to persons unemployed through no fault of their own, to encourage stabilization in employment, and to provide for a state employment service is, therefore, essential to public welfare; and the same is declared to be a proper exercise of the police powers of the state."

6. See footnote 4.

7. Ind. Acts 1936, Ch. 4, § 6, as amended by Ind. Acts 1937, Ch. 125, § 6. The 1936 "Unemployment Compensation Law" was replaced in 1947 by the present "Employment Security Act," which is Ind. Acts 1947, Chapter 208, being also Burns Ind. Stat. Ann. §§ 52-1525 through 52-1563b. No significant changes appear to have been made in the sections with which we are here concerned since the 1937 amendment.

and correctly state the *Bootz* rule in the following quotation from their brief:

"In the *Bootz* case, *supra,* this Court has held, and properly so, that good faith negotiations in and of themselves do not constitute a labor dispute, and that where negotiations are in a fluid state and no impasse exists that an employer may not unilaterally close his doors to his employees."

The employers also recognize another rule which was reiterated in *Bootz,* as follows:

"It is the law of this state that any decision of the Board shall be conclusive and binding as to all questions of fact. We are not at liberty to weigh the evidence and must accept the facts as found by the Board. These facts cannot be disregarded by us unless they are not sustained by any evidence of probative value. *White* v. *Review Board of Indiana, etc.* (1944), 114 Ind. App. 383, 52 N. E. 2d 500; *News Publishing Co.* v. *Verweire* (1943), 113 Ind. App. 451, 49 N. E. 2d 161; *Craddock Furniture Corp.* v. *Nation* (1944), 115 Ind. App. 62, 54 N. E. 2d 295, 55 N. E. 2d 121; *Youngstown Sheet & Tube Company* v. *Review Board of Indiana Employment Security Division* (1954), 124 Ind. App. 273, 277, 278, 116 N. E. 2d 650; *Ross, et al.* v. *Review Board of Indiana Employment Security Division* (1962), 243 Ind. 61, 182 N. E. 2d 585." (237 N. E. 2d at 601, 14 Ind. Dec. at 473.)

Reduced to its essence, their argument is that on the evidence before the board (which, except as we have indicated, they do not charge the board unfairly summarized in the recital above quoted) reasonable men could not have found that an impasse did *not* exist at the time and employers closed their plants. Appellant-employers stress the testimony of Mr. Fred Baer, an attorney who was their negotiating representative, to the effect that the union would accept nothing less than the Chicago contract while the employers would not go beyond their offer of a few cents less than the Milwaukee contract. This is somewhat at variance with the testimony of Mr. James Niedermeyer, the union presi-

dent, summarized in appellant's brief in pertinent part as follows:

> "We called Chicago and found that a settlement had been made, and we gave the employers the Chicago settlement. It was a one sixty-five package, and this was less than demanded earlier. Mr. Baer declined this, and wanted to discuss the Milwaukee package, which we understood to be one sixty-three, or two cents lower than Chicago's. The only difference was the holiday pay, and we did not know the formula. We told Mr. Baer we wanted to look the formula over and discuss it further, but we did not that evening as it was close to midnight. We discussed with Mr. Baer about the men going to work the next day, and we told Mr. Baer we would continue to negotiate and continue on the old contract, and he declined this. We told him we would work out the contract but he declined and the meeting broke up at that point."

If the board inferred from Mr. Niedermeyer's account of what happened that night was that the union negotiators had made no flat rejection of the Milwaukee package offer but had merely requested time to investigate the holiday pay formula before discussing it further and offered to continue working in the interim, one could hardly say that reasonable men might not have drawn the same inference. That evidence fully sustains the finding that "negotiations were in a fluid state and had not reached an impasse."

The employers also attempt to distinguish the evidentiary facts here from those in *Bootz* by pointing out that in *Bootz* there had never been a contract, while in the instant case there was a contract containing a no-strike clause, which expired at the time they closed their plants; that their employees were giving them no assurance that they would stay on the job for any specified time, such as the thirty-day offer in *International Steel;* and that the union had "pulled" a strike in 1965 a few days after the contract expired. If those distinctions were significant, their weight was, nevertheless, a matter for the Board to determine. The appellants

have failed to convince us that these differences *compel* the conclusion that an impasse had been reached.

Appellants have cast their argument in a form designed to give the apearance that the factual conclusions reached by the board here come within five of the seven exceptions to the finality rule stated in *Williamson Co.* v. *Review Board* (1969), 145 Ind. App. 266, 250 N. E. 2d 612, 616, 18 Ind. Dec. 403, 410.[8] They have succeeded only in creating some doubt that they understand those exceptions. No useful purpose would be served by detailing appellants' arguments.

Interspersed in their argument that "[t]he evidence on which the Review Board based its conclusion was devoid of probative value", are citations of and quotations from federal cases concerning the employers' right under the National Labor Relations Act to use the lockout as an economic bargaining weapon "in support of a legitimate bargaining position." Appellants fail to note that there is a distinction between the rights and duties of employers and employees under the National Labor Relations Act and the rights of

---

8. In *Williamson* we said:

"A rather basic premise of [judicial] review [of decisions of administrative agencies] is that this court is not at liberty to weigh the evidence and that we must accept the facts as found by the particular Board involved. . . .

"However, there are several exceptions to this general rule. . . .

"The reviewing court may reverse the decision of the Review Board if:

"(1) The evidence on which the Review Board based its conclusion was devoid of probative value;

"(2) The quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a ratoinal basis;

"(3) The result of the hearing before the Review Board was substantially influenced by improper considerations;

"(4) There was no substantial evidence supporting the conclusions of the Review Board;

"(5) The order of the Review Board, its judgment or finding, is fraudulent, unreasonable or arbitrary;

"(6) The Review Board ignored competent evidence;

"(7) Reasonable men would be bound to reach the opposite conclusion from the evidence in the record."

The exact words of numbers (1), (3), (4), (6) and (7) have been made the Captions of appellants' Specifications I through V in the argument portion of their brief.

unemployed persons under the Employment Security Act. A similar failure with respect to the right to strike was discussed by our Supreme Court in *Walter Bledsoe Coal Co.* v. *Review Board* (1943), 221 Ind. 16, 46 N. E. 2d 477.

There the appellant-coal company and its employees had failed to agree on the terms under which work might continue after expiration of the union contract and the employees quit work at the hour of expiration. In rejecting their argument that they were entitled to benefits because they were not at fault in the sense that their conduct was not "something worthy of censure", the court said:

> "It is perfectly legal for employees to contend for better wages and working conditions and to refuse work if their demands are not complied with, and it cannot legally be said that such action is worthy of censure or that it constitutes wrongdoing. It must be concluded that the purpose of the act was to provide benefits to those who were involuntarily out of employment, and not to finance those who were willingly and deliberately refusing to work because of a refusal of their employers to accede to demands for higher wages. . . .

> "Here was a disagreement between the employer and the employees as a whole as to wages; a demand by employees for new and different terms, and a refusal of the employer to comply, and a refusal of the employees to work as a consequence. It was a controversy. This was a strike in the ordinary meaning of the word. . . . Strikes are generally considered as coercive. This strike was the result of disagreement after negotiations about wages and working conditions. The fact that the contract under which the employees had been working had expired is of no importance. They were unemployed because of their refusal of an offer of work for wages and under conditions identical with those provided in their expired contract."

The *Bootz* rule is nothing but the *Bledsoe* rule applied to a lockout. It is perfectly legal for an employer to contend for lower wages and less favorable working conditions than his employees' bargaining agent is willing to accept and (in circumstances defined by federal stat-

utes and decisions) he may even close his plant to attempt to coerce his employees into accepting his terms. But he cannot use the Employment Security Act to further his cause. If he closes his plant while his employees are still bargaining in good faith, are working at normal efficiency and with normal attendance, and are willing to continue working while negotiating, he cannot successfully demand that his employees be denied benefits. Conversely, employees cannot draw benefits during a work stoppage their intransigeance has contributed to creating, even though, otherwise, they may have a perfect right to refuse to yield to their employer's demands.

By holding that a "labor dispute" has not caused a work stoppage by lockout unless and until an impasse has developed, the labor dispute disqualification of section 1504 (Burns § 52-1539c) is brought into harmony with the act's declared purpose. And when the Review Board finds, as it does here, that no impasse had been reached at the time the plant was closed, we cannot reverse the Board's adjudication of eligibility when there is no showing that the finding suffers from some infirmity judicially fatal to its finality.

The decision of the Review Board is Affirmed.

Pfaff, J., not participating.

Hoffman, P.J., and Sharp, J., concur.

NOTE.—Reported in 263 N. E. 2d 218.