No. 13727

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

MONTANA READY MIXED CONCRETE
ASSOCIATION, a corporation,

Plaintiff and Appellant,

-vs-

BOARD OF LABOR APPEALS, et al.,

Defendants and Respondents.

---

Appeal from: District Court of the First Judicial District,
Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

For Appellant:

Burton and Waite, Great Falls, Montana
Leslie S. Waite III argued, Great Falls, Montana

For Respondents:

Moody Brickett argued, Helena, Montana
Hilley and Loring, Great Falls, Montana
Emilie S. Loring argued, Great Falls, Montana
McKittrick and Duffy, Great Falls, Montana
D. Patrick McKittrick argued, Great Falls, Montana

---

Submitted: December 2, 1977

Decided: DEC 20 1977

Filed: DEC 20 1977

*Thomas J. Kearney*

Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

This case concerns the administrative proceeding and decision of the Board of Labor Appeals and certain claimants represented by the Joint Council of Teamsters #23 and Local Union No. 400, and their employers who are members of the Montana Ready Mixed Concrete Association. The administrative proceedings were held during the year 1972. The appeal tribunal on April 14, 1975, found that the claimants were disqualified from receiving unemployment benefits. An appeal was made to the Board of Labor Appeals, and after hearing the matter, the Board on September 22, 1975, reversed the decision of the appeal tribunal and found that the claimants were entitled to unemployment compensation benefits. Thereafter, the employer filed a petition for review of the Board's decision in the District Court of the 1st Judicial District, Lewis and Clark County. On January 31, 1977, the District Court issued its opinion sustaining the decision of the Board and denying the employer's petition for judicial review. From this decision this appeal is taken.

In this case the Montana Ready Mixed Concrete Association, hereinafter referred to as the employer, had an agreement with the Joint Council of Teamsters #23 and International Union of Operating Engineers, Local No. 400, hereinafter referred to as the employees. This agreement covered wages, hours, and working conditions. The expiration date of this agreement was February 29, 1972.

Prior to the expiration of the agreement, the employees, through their unions, opened the agreement for renegotiation. On March 1, 1972, negotiations were resumed. In the afternoon the employer notified the employees that their last proposal was not acceptable and resubmitted its last proposal as its final offer. At the conclusion of this meeting the employees' unions agreed to take the employer's last offer to its members for a vote. The

employer stated its members would lock up their plants on Monday, March 6, 1972, unless it received notice of acceptance of its proposal by noon, Sunday, March 5, 1972. The employer's offer was thereafter rejected. On Monday, March 6, the employer closed its plants, and the employees who reported for work were not allowed to work. Employment was withheld from them until March 16, 1972, when a settlement was negotiated and the plants reopened. The focal question is whether an impasse had been reached during the 1972 negotiations between the parties which would exclude the employees from unemployment compensation benefits. The unions deny this and insist that there had been only three negotiating sessions, that there had been movement by both sides, and that there was no evidence that continued negotiations, as requested by the unions, would have been unsuccessful.

The employer filed another suit in Federal Court entitled "Montana Ready Mix and Concrete Productions Assoc. v. The State of Montana et al." In that case, the employer claimed the Board of Labor Appeals had interfered with the employer's collective bargaining rights and sought to enjoin the Board from enforcing its decision. U. S. District Judge Russell E. Smith granted judgment to the State of Montana, holding that the Montana Unemployment Compensation Law, as written, is neutral and does not in any way impinge on the collective bargaining process.

The issues presented for review are:

1. Whether the Board and District Court erred in interpreting the Montana Unemployment Disqualification Law?

2. Whether the Board's decision improperly intruded upon and interfered with the employer's federally protected right to bargain collectively and to engage in a lockout?

This appeal centers around the Montana Unemployment Compensation Law Section, which is section 87-106, R.C.M. 1947. Subsection (d) provided as follows in 1972:

-3-

"87-106. Disqualification for benefits. An individual shall be disqualified for benefits--

" * * *

"(d) For any week with respect to which the commission finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that--

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;

"Provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises; provided, further, that if the commission, upon investigation, shall find that such labor dispute is caused by the failure or refusal of any employer to conform to the provisions of any law of the state wherein the labor dispute occurs or of the United States pertaining to collective bargaining, hours, wages or other conditions of work, such labor dispute shall not render the workers ineligible for benefits."

The labor dispute disqualification is a two step procedure. First, if the commission finds that unemployment is due to a labor dispute where the claimant was last employed, the claimant is disqualified. Secondly, the disqualification is removed if the commission finds that the employee is not participating or directly interested and he does not belong to the grade or class of workers who are participating. The Montana Unemployment Compensation Act does not define "labor dispute". The employer insists that the employees were "locked out" and that a "lockout" is automatically a labor dispute. The language of the statute lends no help. Therefore, this Court must determine whether it was the intent of the legislature in enacting section 87-106(d), R.C.M. 1947, that this

section apply where the employer locks out the employees.

The vital question is whether the unemployment was caused by a labor dispute. The word "lockout" is meaningless unless it is applied to the circumstances of the case. The Board of Labor Appeals held that the claimants were not unemployed because of a "labor dispute". In Ross v. Review Board of Indiana Employment Security Division, (Ind.App. 1961), 172 N.E.2d 442, 448, the court, in upholding an award of unemployment compensation benefits, held:

> " * * * The existence of differences between labor and management does not ipso facto constitute a labor dispute causing a stoppage of work. * * *"

The court went on to say:

> " * * * While labor may use the strike and management may use the lockout, neither can use the Employment Act as a weapon, that is, in the case of management as a weapon to disqualify workers from unemployment benefits, and in the case of labor in using the strike and at the same time hoping to avoid disqualification for unemployment benefits."

In the instant case the record is unclear as to the state of the negotiations at the time of the lockout. The record shows that negotiations between the employer and the bargaining agents of the employees were in progress all the time prior to the closing of the plants. After attempts to consummate a new contract, the employer decided a labor dispute existed and closed the plants, thus arriving at a lockout status.

We conclude that good faith negotiations between representatives of management and labor, where the facts show that the bargaining is in a fluid state and no impasse has occurred, gives neither party the right to declare a labor dispute. To hold otherwise would be to defeat the purpose of the law. Such an interpretation would defeat the objective of contract negotiations in all industries. To promote the general welfare it is necessary to encourage good faith collective bargaining at all times. If we were

to interpret every difference of opinion between employer and employee as a labor dispute, we can perceive a situation where no one could receive unemployment benefits and labor-management relations would be in chaos.

However, in this case it is disputed whether or not bargaining was in a fluid state or whether an impasse had in fact been reached. To be sure, there was argument and wrangling between the negotiators over the terms of the proposed new contract. The true reason for the lockout at the employer's businesses is not clear from the record. However, it does not seem that the lockout was used to improve the bargaining power of the employer and therefore, we will give the employer the benefit of the doubt and hold that in this case the lockout arose from a labor dispute.

Since this Court finds that the lockout arose from a "labor dispute", it becomes necessary to determine whether the disqualification section was intended by the legislature to apply to the factual situation presented by this case. Section 87-102, R.C.M. 1947, sets out clearly the public policy behind the unemployment compensation act. This section states:

> "Declaration of state public policy. As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." (Emphasis added.)

-6-

This section declares a legislative purpose of providing for payment of benefits to persons unemployed through no fault of their own. In this case, the employer contends the employees participated in the labor dispute through their representative unions and that they were interested in the outcome of the lockout and therefore section 87-106(d) mandates their disqualification. Both subsections (1) and (2) provide for the disqualification where the employee is directly interested in the labor dispute. The respondents contend that they were not participants in the lockout, they were victims of it. In reviewing the negotiations prior to the lockout, it is apparent that the employees had not threatened the employer with a strike or a work slowdown. The lockout was not brought on by the action of the employees except for the fact that they voted to reject the employer's last offer. It appears as though no demands had been made except for those ordinarily incident to any negotiating procedure. There was no testimony that a strike vote had ever been taken or was even contemplated by the employees. The employees' representative unions were willing to continue negotiations and so informed the employer prior to the lockout.

Where an employer lockout has resulted in disqualification from benefits there have been additional facts, not present in this case, showing voluntary action on the part of the employees precipitating the employer's action. It would be difficult for reasonable minds to reach the conclusion that the lockout was precipitated by the union or the employees in view of the fact that the unions' attitude was that of negotiating any differences which the employees had through the collective bargaining process and the action of the employees seeking to return to work and being refused employment by the employer. The employees involved were unemployed through no fault of their own. The District Court was correct in sustaining the administrative decision of the Board of Labor Appeals granting them unemployment compensation.

Employer further contends that the disqualification statute, although neutral on its face, was improperly applied in this case and therefore interfered with the employer's federally protected right to bargain collectively and to engage in a lockout. The many cases cited by the employer involving federal preemption and conflict with state law do not deal with this problem, but rather with state action which interferes with federal regulation of labor relations. The employer has cited none, and we can find no case which holds as a matter of law that the preemption doctrine is applicable to the situation here.

The case of Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L ed 2d 1 (1974) is distinguishable on the facts and does not support employer's position. In McCorkle the U. S. Supreme Court declared that it was the intent of Congress to make maintenance of government neutrality contingent on treating otherwise eligible strikers no differently from nonstrikers in the receipt of public assistance. It is important to note that this case dealt with employees who were on strike. It did not deal with employees who were ready, willing, able and available for work who had been precluded from performing their job by a lockout. In McCorkle the Court found no merit in the contention that eligibility of strikers for public assistance frustrates national labor policy of free collective bargaining by altering relative economic strength of parties.

Here, we find that the decision of the Board, affirmed by the District Court, does not interfere or intrude upon federal labor policy. The decision of the District Court is affirmed.

_Frank J. Haswell_
Justice

-8-

We Concur:

_____
Chief Justice

_____
Hon. Peter G. Meloy, sitting in
place of Mr. Justice Gene B. Daly.

_____

_____
Justices