**USS, A DIVISION OF USX CORPORATION, Appellant (Employer Below),**

v.

**REVIEW BOARD OF the INDIANA EMPLOYMENT SECURITY DIVISION, and Lanzo Aaron, et al. and Alvin Aikens, et al., Appellees (Claimants Below).**

No. 93A02–8708–EX–340.

Court of Appeals of Indiana, Fourth District.

Sept. 8, 1988.

---

Linley E. Pearson, Atty. Gen., Donald B. Kite, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for co-appellee Review Bd. of the Indiana Employment Sec. Div.

S.G. Clark, USS, Pittsburgh, Pa., James McHie, McHie, Myers & McHie, Hammond, Michael R. Maine, Elizabeth T. Young, Baker & Daniels, Indianapolis, for appellant.

Bernard Kleiman, General Counsel, Carl B. Frankel, Associate General Counsel, United Steelworkers of America, AFL–CIO, CLC, Pittsburgh, Pa., Jeremiah A. Collins, Virginia A. Seitz, Bredhoff & Kaiser, Washington, D.C., David L. Gore, Kleiman & Whitney, Chicago, Ill., Patrick McFarland, Michael Pannos, Pannos and Mindel, Merrillville, for appellees.

CONOVER, Presiding Judge.

Appellant–Employer USX Corporation (USX) appeals the Indiana Employment Security Division Review Board's (Board) award of unemployment benefits to appellees-claimants.

We affirm.

USX presents two issues for our review. Restated, they are:

1. whether the Board used an erroneous definition of labor dispute, and

2. whether there was sufficient evidence of probative value to support the Board's finding a labor dispute did not exist.

A collective bargaining agreement was negotiated in 1983 between the United Steel Workers of America (USWA) and the coordinating steel companies, a group consisting of USX (then known as U.S. Steel), LTV Steel, National Steel, Bethlehem Steel, Inland Steel, and Armco Steel. It was due to expire August 1, 1986, at 12:01 A.M. During the 1986 contract negotiations these companies individually bargained with USWA.

In January 1986, USWA called upon all steel companies to engage in early collective bargaining. LTV, Bethlehem, Armco, Inland, and National Steel all agreed to enter early negotiations with USWA. However, negotiations between USX and USWA did not commence until June 12. By then, USWA had reached agreements with LTV, Bethlehem, and National. It also agreed to a three month contract extension with Armco. USWA and USX agreed to negotiate a collective bargaining agreement comparable to the agreements reached between USWA and USX's competitors. USX then set July 4 as a settlement deadline.

Throughout 1986 orders for product continually fell. By the time negotiations began, orders decreased to one-third their normal level due to customer concern over whether a new agreement could be reached by August 1. Contemporaneously, USX began to implement a strike hedge program at the Gary Works.[1] As a result, the Board found "little if any production was planned for Gary Works for an extended period after July 31, no matter what happened in the negotiations."

A "linchpin" issue in the negotiations was economic concessions. USX initially proposed an economic package which it never expected USWA to accept because it included hourly wages $6 below the industry average. The package was rejected on June 30. Negotiations then ceased until after the July 4 deadline had passed.

At a July 9 meeting USX made a new proposal and told USWA the company would soon shut down some of its plants because orders were declining.[2] The next day union officials of General Motors Fisher Willow Springs (Fisher) plant (the largest customer of the Gary Works), told Wroblewski Gary Works had already lost the August and September orders from Fisher, and would shortly lose the orders for the balance of the year unless a settlement was reached.

Throughout July USX intensified its strike hedge activities in Gary. It shipped out enormous quantities of finished product for storage. Also, it shipped unfinished product to be finished elsewhere although finishing is normally done at the Gary Works. Because of these activities, supervisors at the Gary Works told USX employees there would be layoffs whether or not an agreement was reached by August 1. In addition, Gary Works management decided to use the period following the contract expiration to do needed repair work on the main blast furnace. Extensive layoffs are necessary when this furnace is down.

USX made an offer on July 9 which was rejected by USWA on July 15. Subsequently, on July 27, USWA offered a package which would reduce USX's labor costs by $.75 per hour and save USX $.40 per hour in overtime pay. USX then modified its economic proposal by offering USWA a new package which included a $.72 per hour increase.

Contracting out bargaining unit work was the other issue which the parties considered "linchpin." On this issue USWA

---

1. In a strike hedge program, production is stepped up, finished product is shipped out, stored, and then sold after the strike has commenced.

2. Similarly, Richard Wroblewski (Wroblewski), the manager of business planning for the Gary Works, stated that even if agreement were reached by August 1, business planning would be reduced to a skeleton crew for two to three months. When there are layoffs at the Gary Works business planning department, there are corresponding layoffs in production and maintenance.

sought more restrictive contracting out limitations with USX than it had agreed to with any other steel company. However, in its July 27 proposal, USWA scaled back its demands and proposed contracting out restrictions comparable to those placed upon the other companies in the industry.

At the July 31 bargaining session, considerable progress was made concerning economic concessions. USX's chief negotiator gave a "signal" the company was willing to reduce its economic demands by $.32 per hour.[3] USWA indicated it could not conclude an agreement, however, it did reduce its economic demands by $.82 per hour. This proposal would have lowered USX's total labor costs to $23.39 per hour, a figure $1.03 lower than LTV's costs, $.29 lower than Bethlehem's, and $.59 lower than the industry average.

With the contract due to expire at midnight, USWA offered to continue working under the terms of the 1983 contract while the parties continued to negotiate. The company rejected the offer and told USWA its facilities were closed.

That night at approximately 8:00 or 9:00 P.M. another signal was made showing the employer's further willingness to modify its economic proposal by approximately $.25 per hour. Based on this signal, union officials concluded an agreement could not be reached on the 31st; however, they believed a settlement could be reached if negotiations continued.

Throughout the negotiations, the union did not call a strike, did not state it would strike, and did not issue a strike notice to USX. Before a strike can be called, three steps must be taken: (1) the industry conference of local union presidents must vote to strike, (2) the international executive board must set a strike date, and (3) the international president must approve the strike. None of these steps were taken.

On the evening of July 31, Gary Works management, on instructions from USX headquarters, informed USWA that beginning with the 11:00 P.M. shift no employee would be permitted to work, and any employee who reported for work would be turned away and given a copy of a notice from USX stating "USWA has struck USX." USX knew it would be distributing a false statement.

Union members, who were not otherwise unemployed for other reasons such as vacation or layoff, reported for work with the shift beginning midnight August 1, 1986. They were turned away. Subsequently, the employees filed individual claims for unemployment compensation benefits. The claims were consolidated into case numbers 86–LD–26 and 86–LD–40. The referee found claimants were not unemployed due to a labor dispute and were entitled to unemployment benefits.[4]

USX appealed the referee's decision to the Board. The Board affirmed the judgment of the appeals referee.[5] USX now appeals.

Judge Robertson, writing for the majority in *Auburn v. Review Board* (1982), Ind. App., 437 N.E.2d 1011, 1014–1015, stated our well known standard of review for appeals from the Board.

The decisions of the Review Board in labor disputes are subject to a two-tier

---

**3.** As the referee stated, "a signal is an indication that the employer is willing to make a further revised offer but before the offer [is] made officially, the union had to indicate that it would accept the offer."

**4.** I.C. 22–4–15–3(a) (the labor disqualification section) provides:

An individual shall be ineligible for waiting period or benefit rights: For any week with respect to which his total or partial or part-total unemployment is due to a labor dispute at the factory establishment or other premises at which he was last employed.

**5.** The Board found claimant's unemployment was caused by three factors: (1) the loss of orders experienced by USX was due to customers concerns about the ability of the parties to settle their differences; (2) actions by USX in anticipation of the threatened USWA strike, which actions included producing and shipping products for outside storage and outside finishing operations; and (3) the need for equipment repair. It further stated "the employees were turned away (from work) not because negotiations had ceased to be fluid or because an impasse had been reached, ... but because USX concluded it was in its economic and strategic interest not to allow these employees to work."

standard of review. Under this standard, the Review Board's finding of ultimate fact is the conclusion and the findings of basic facts are the premises from which the agency deduced its conclusion. At the first level of review, this court only examines the relationship between the conclusion and the premises and inquires whether the Review Board's deduction is "reasonable". In the second step of review, we examine the nexus between the premises and the evidence presented to determine whether the evidence justified the findings of basic facts. In the second tier of review, this court will not reweigh the evidence or judge the credibility of witnesses but must accept the facts found by the Review Board unless:

1. The evidence on which the Review Board based its conclusions was devoid of probative value;

2. The quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis....

4. There was not substantial evidence supporting the conclusion of the Review Board....

[or]

7. Reasonable men would be bound to reach the opposite conclusion from the evidence in the record. (Citations omitted).

■ The standard used to determine whether a labor dispute exists when negotiations are ongoing originated in *Bootz Mfg. Co. v. Review Board* (1968), 143 Ind.App. 17, 237 N.E.2d 597. The standard is unquestionably well settled. *City Pattern & Foundry Co. v. Review Board* (1970), 147 Ind.App. 636, 640, 263 N.E.2d 218, 222. In *Bootz*, the employees continued and were available to work, did not attempt to curtail production, and were engaged in good faith contract negotiations when management locked the employees out of the plant. The *Bootz* court affirmed the Board's award of unemployment compensation. In holding a labor dispute did not exist, the court announced what has become known as the *Bootz* "impasse" standard. The standard states:

a labor dispute does not exist when bargaining is in a fluid state and an impasse in bargaining has not surfaced.

*Bootz, supra,* 143 Ind.App. at 23, 237 N.E. 2d at 601.

Subsequently, in *Abbett v. Review Board* (1971), 150 Ind.App. 202, 275 N.E.2d 827, the *Bootz* "impasse" standard was given greater clarity. The *Abbett* court defined impasse as being the absence of an atmosphere in which the resolution and settlement of the disputed issues is reasonably foreseeable. *Abbett, supra,* 150 Ind.App. at 207, 275 N.E.2d at 831. Further, under *Gold Bond Bldg. Prod. Div. v. Review Bd.* (1976), 169 Ind.App. 478, 490, 349 N.E.2d 258, 265, a settlement is not reasonably foreseeable when the parties are deadlocked on certain crucial issues. Room for movement on relatively minor issues does not obviate an impasse engendered by deadlock on "key" issues. *Id.*

USX asserts the *Bootz* standard contradicts prior case law. We disagree.

In *Walter Bledsoe Coal Co. v. Review Board* (1943), 221 Ind. 16, 46 N.E.2d 477, the claimants offered to continue working subject to any agreement which would ultimately be reached in negotiations, despite the impending expiration of their contract. Management rejected this proposal and counter-proposed the employees continue to work under the current contract until an agreement could be reached. Claimants then walked out. The appellate court affirmed the Board's finding a labor dispute did not exist. In reversing, Justice Fansler writing for the majority stated:

The declared purpose [of the employment security act] is to provide benefits for persons unemployed through no fault of their own.... Thus fault must be construed as meaning failure or volition. This construction is consistent with the provision that there shall be no benefits paid if unemployment is due to a work stoppage because of a labor dispute.... They were unemployed because of their refusal of an offer of work for wages

and under conditions identical with those provided in their expired contract.

In, *City Pattern, supra,* 263 N.E.2d at 224, the court harmonized *Walter Bledsoe* with *Bootz.* In doing so it stated:

> The *Bootz* rule is nothing but the *Bledsoe* rule applied to a lockout. It is perfectly legal for an employer to contend for lower wages and less favorable working conditions than his employees' bargaining agent is willing to accept and [in circumstances defined by federal statutes and decisions] he may even close his plant to attempt to coerce his employees into accepting his terms. But he cannot use the Employment Security Act to further his cause. If he closes his plant while his employees are still bargaining in good faith, are working at normal efficiency and with normal attendance, and are willing to continue working while negotiating, he cannot successfully demand that his employees be denied benefits. Conversely, employees cannot draw benefits during a work stoppage their intransigence has contributed to creating, even though, otherwise, they may have a perfect right to refuse to yield to their employer's demands.

In *Abbett, supra,* 275 N.E.2d at 830, the court quoted *City Pattern,* stating:

> by holding that a labor dispute had not caused a work stoppage by lockout unless and until an impasse [had developed in negotiations, the *Bootz* standard has] brought the labor dispute disqualification provision into harmony with the act's declared purpose to provide payment of benefits to persons who are unemployed through no fault of their own.

The *City Pattern* and *Abbett* courts were correct in concluding *Walter Bledsoe, Bootz,* and the policy of the Indiana Employment Security Act are consistent. The *Bootz* standard, namely, employees are unemployed through "no fault of their own" when an impasse in bargaining has not been reached, but their employer has locked them out for his own purposes, was merely the first statement of the Indiana "lockout" rule in unemployment compensation cases.[6] It has been consistently followed since then. Thus, USX's contention *Bootz* contradicts prior case law is without merit.

■ USX next contends the Board erroneously found an impasse in bargaining did not exist here. In doing so, it merely asks us to reweigh the evidence. It asserts USWA took a strike vote, engaged in strike counseling sessions, participated in strike management with USX officials, prepared picket signs and solicited picket line volunteers. It further notes testimony which states the parties were "very, very far apart" on the major issues of economic concessions and contracting out. However, these contentions ignore the fact USWA's activities exhibited nothing more than strike preparation. USX's testimony was only one piece of evidence before the referee and the Board.

There is substantial evidence of probative value supporting the Board's determination an impasse in bargaining had not been reached because (1) USX and USWA agreed to negotiate a collective bargaining agreement comparable to the agreements reached between USWA and USX's competitors, (2) settlement was reasonably foreseeable since the parties were not deadlocked on the linchpin issues of economic concessions and contracting out, and (3) all remaining issues were relatively minor. The shutdown of Gary Works was due to USX's failure to negotiate early in 1986 as did its competitors, USX's institution and

---

6. Both Alabama and Montana also subscribe to the *Bootz* rule. See *Flowers v. Dept. of Industrial Relations* (1983), Ala., 435 So.2d 76, 79 ("we further opine that the Legislature did not intend that Section 25–4–78(1) should act to disqualify employees given layoff notices from receipt of unemployment benefits where contract negotiations are ongoing"); *Montana Ready Mixed Concrete v. Board of Labor* (1977), Mont., 572 P.2d 915, 918 "[w]e conclude that good faith negotia- tions between representatives of management and labor, where the facts show that the bargaining is in a fluid state and no impasse has occurred, gives neither party the right to declare a labor dispute ... West Virginia appears to go even further and has held the labor dispute disqualification does not apply to any locked out employees, whether or not an impasse has been reached. See *Lee–Norse Co. v. Rutledge* (1982), W.Va., 291 S.E.2d 477, 482–484.

dramatic increase of strike hedge activities, and its intended renovation of the main blast furnace.

■ USX next correctly asserts employees are ineligible for unemployment compensation when they have caused a labor dispute, and correctly cites *Aaron v. Review Board* (1981), Ind.App., 416 N.E.2d 125; *Carnegie–Illinois Steel Corp. v. Review Board* (1947), 117 Ind.App. 379, 72 N.E.2d 662; *Frank Foundries Corp. v. Review Board* (1949), 119 Ind.App. 693, 88 N.E.2d 160, in support of that proposition. However, USWA did not cause the work stoppage in this case. It engaged in negotiations with USX until the eleventh hour, offered to continue working, and its members reported for work. Further, the USWA agreed to reach an agreement comparable to that of USX's competitors and asked USX to enter into early negotiations. We find no error here.

USX next asserts the Board committed reversible error because it applied the definition of labor dispute found in *Bootz* rather than the definition thereof found in *Adkins v. Indiana Employment Security Division* (1946), 117 Ind.App. 132, 138, 70 N.E.2d 31, 33. USX argues the *Bootz* court erroneously relied on the Employment Security Act's general purpose to define labor dispute while the *Adkins* court correctly borrowed the definition of labor dispute from the predecessor statute of I.C. 22–6–1–12(c), the anti-injunction act.[7] We disagree.

In *City Pattern, supra*, 263 N.E.2d at 221–222, the court explained the *Bootz* rule was spawned by the general purpose provisions of the Employment Security Act. It noted the Indiana legislature has directed the courts "to follow the guidance of its public policy statement in section 101 of the Employment Security Act." *Id.* The primary legislative purpose of the Act is "to provide for the payment of benefits to persons unemployed through no fault of their own" and that such purpose is "essential to the public welfare." *Id.*, see also *Ross v. Review Board* (1961), Ind.App., 172 N.E.2d

442, 447 (citing *Blakely v. Review Board* (1950), 120 Ind.App. 257, 90 N.E.2d 353). Moreover, this interpretation embodies "the fairness of seeking to avoid any interpretation of the act which would result in arbitrarily denying benefits to workers unemployed through no fault of their own." *City Pattern, supra*, 263 N.E.2d at 221–222.

■ The Employment Security Act should be liberally construed in favor of the employee. *Studebaker v. Review Board* (1984), Ind.App., 464 N.E.2d 382, 384. If it is susceptible of more than one interpretation it is to be construed in such manner as to effectuate the humanitarian intention of the legislature in enacting it. *Holmes v. Review Board* (1983), Ind.App., 451 N.E.2d 83, 86–87. Legislative intent as ascertained from an act as a whole prevails over the strict literal meaning of any word or term used therein. *Holland v. King* (1986), Ind.App., 500 N.E.2d 1229, 1236. Legislative intent is foremost in construing any statute. *Alvers v. State* (1986), Ind. App., 489 N.E.2d 83, 88. Indispensable to ascertaining the legislature's intent is a consideration of the goals sought to be achieved and the reasons and policy underlying a statute. *Id.* In addition, words are given their plain meaning and this court may look beyond the statute's language to the titles and headings of the statute. *Id.* In construing words in a single section of a statute, we must construe them with due regard for all other sections of the act in order to ensure the spirit and purpose of the act is carried out. *Holland, supra*, at 1236.

As stated above, we agree with the *Abbett* and *City Pattern* courts the *Bootz* "impasse" standard harmonizes the act's declared purpose with the labor dispute disqualification section. In contrast, the "any controversy" standard urged by USX would defeat the act's declared purpose when negotiations are still fluid. Were that standard adopted, the initiation of collective bargaining would allow management to immediately "lockout" employees

---

7. The anti-injunction act states in pertinent part "the term labor dispute includes any controver-  sy concerning the terms or conditions of employment."

in an effort to coerce them into settlement. Employees always would be ineligible for unemployment compensation because a "controversy" would automatically exist whenever collective bargaining was initiated. Such a result does not square with the Act's purpose. As stated by the *Bootz* court:

> to promote the general welfare and in the interest of public policy it [is] necessary to encourage good-faith collective bargaining at all times, and if every difference of opinion between employer and employee were to be interpreted as a labor dispute, the result would be that no one could receive unemployment benefits.

*Bootz, supra,* 237 N.E.2d at 601.

Because negotiations had not reached an impasse, the employees were eligible for unemployment benefits.

AFFIRMED.

GARRARD, P.J., and HOFFMAN, J., concur.